PEOPLE'S NATIONAL BANK OF ROCK ISLAND v. CENTRAL TRUST COMPANY, Appellant.

Division One, February 10, 1904.

1. **Action at Law:** DEMURRER: REVIEWABLE. In an action at law, tried by the court sitting as a jury, the ruling of the court on a demurrer to the evidence is reviewable on appeal. (Distinguishing Miller v. Breneke, 83 Mo. 163; Bethune v. Railroad, 139 Mo. 574, and Wischmeyer v. Richardson, 153 Mo. 556.)

2. **Fraud and Deceit:** WHEN FRAUD IS IMPLIED. Fraud is a willful wrong. Whether fraud in fact or fraud in law, it implies the willful doing of a wrong. Sometimes without proof of an actual evil purpose, the law will imply fraud, but only in a case where one has been so oblivious of his duty, showing such disregard for the rights of others, as to make his conduct as bad as if actuated by a desire to do wrong.

3. ———: PLEADING AND PROOF: EXISTENCE OF MORTGAGE. In a suit for fraud and deceit, plaintiff bottomed its case, not on the mere fact that the representations made by the defendant trust

company as to the security behind notes which plaintiff bought from defendant were not true, but upon the wrongful conduct of defendant, in making a positive statement which was not only untrue, but of the truth or falsity of which the defendant had so little, if any, information, that defendant's act in making the statement was reckless and in utter disregard of whether it was true or false, and not only that, but that it was made while the defendant was conscious that it did not know that it was true, and also, that it was made with a knowledge that it was untrue. *Held,* that the cause of action can not be sustained by a showing which goes no further than to show that the representation that the notes were secured by a mortgage on cattle was untrue; for, if the mortgage was actually in existence and recorded but the cattle were not in existence, and the defendant trust company bought the notes in the market at the usual banking discount, having first taken that care that a bank accustomed to handle such paper usually took to satisfy itself. that the security was as represented, and then, without further investigation or further information, sold them to the plaintiff, describing them as they appeared on their face to be, then defendant's conduct, in view of these facts, was not correctly described in the petition. Nor did such facts prove the averments of the petition, which charged willful fraud. To sustain those averments the evidence must show that the nature of the transaction was such that the defendant would be presumed to have personal knowledge of the truth or falsity of the statements contained in the mortgage, and that the plaintiff had the right to believe defendant had such knowledge.

4. ———: PRESUMPTION STATEMENT OF UNTRUTH. The proposition that "to state what is not known to be true is just as criminal in the eye of the law as to state what is known to be false" can not be held to mean anything more than that if the facts are of such a nature that a man is presumed to have personal knowledge of them and is presumed to know that the person with whom he is dealing relies on him for information, he is as guilty if he makes a false representation concerning the matter when he is conscious that he knows nothing about it, as he would be if he should state what he knows to be untrue. (Distinguishing Buford v. Caldwell, 3 Mo. 477.)

5. ———: ———: ACTUAL KNOWLEDGE. Defendant represented that the notes it sold plaintiff were secured by a mortgage on cattle, which was true, but the mortgage was of no value because the cattle described therein did not exist. The evidence showed that notes like these were handled in large quantities by banking concerns in the city where the defendant trust company was located, that they took them on the face of the names they bore and of the commission firms that offered them for sale,

and never sent out messengers to the farms to round up the cattle and verify the statements contained in the mortgages, and that the plaintiff knew how such notes were marketed. *Held*, that the facts did not justify the plaintiff in presuming, when defendant offered it the notes with the assurance that they were secured by a mortgage on cattle, that defendant was undertaking of its own knowledge to verify the truth of that assurance, and hence no intention to deceive being shown, no judgment for fraud and deceit could stand.

Appeal from Jackson Circuit Court.—*Hon. J. H. Slover*, Judge.

REVERSED.

*Garland M. Jones* and *Scarritt, Griffith & Jones* for appellant.

(1)   There is no misrepresentation of fact in the statement of defendant upon which this action is founded.   The language relied upon as constituting the fraud for which defendant should respond in damages, namely, ''a note is secured by chattel mortgage on certain stuff,'' is probably as common an expression as any used by persons engaged in trade.   It seems very strange, if it has such pregnant meaning as is contended for by plaintiff, that the law books which record the controversies between such men have not already made it clear that by such language the user intends to convey the idea that the stuff described in the mortgage is at the time the statement is made in existence and in condition it is described to be in the mortgage; that the title of the mortgagor thereof is indefeasible.   (2)   Defendant acted in good faith in making the representation relied upon as the basis of this action.   Its officers believed the Baumbaugh note to be secured by a mortgage on the identical cattle described in it, a copy of which mortgage came into their possession with the note, and that belief was founded upon such representations made to them by responsible men in the ordinary course of

business that any reasonable man would have entertained the same belief. They showed the sincerity of their belief by investing the corporation's money and their own in the paper. These undisputed facts preclude a recovery in deceit. No Missouri case goes to the extent of holding that a person, who, upon reasonable grounds believes a certain state of facts to exist, can be mulcted in damages for deceit because of his statement made in good faith of the existence of those facts. Houston v. Tyler, 140 Mo. 268; Bank v. Byers, 139 Mo. 652; Hamlin v. Abell, 120 Mo. 188; Dulaney v. Rogers, 64 Mo. 201; Lovelace v. Suter, 93 Mo. App. 440; Paretti v. Rebenack, 81 Mo. App. 498; Felix v. Shirley, 60 Mo. App. 624; Redpath v. Lawrence, 42 Mo. App. 101; Koontz v. Kaufman, 31 Mo. App. 397; Arthur v. Mfg. Co., 12 Mo. App. 335; Bank v. Sells, 3 Mo. App. 85; Lord v. Goddard, 13 How. 198; Addison on Torts (Wood's Ed.), secs. 1177, 1178; 1 Benj. on Sales (Corbin's Ed.), sec. 638; Cooley on Torts, pp. 500, 501; Webb's Pollock on Torts (Eng. Am. Ed.), pp. 355, 362, 364, 368; Bigelow on the Law of Fraud, pp. 509-520.

*Wollman, Solomon & Cooper* for respondent.

(1) The case was tried by the court sitting as a jury, a jury having been waived, and there were no declarations of law, or instructions asked, given or refused, but simply a general finding for plaintiff. It follows, therefore, that the judgment will not be disturbed for there is nothing for this court to review. Miller v. Breneke, 83 Mo. 163; Bethune v. Railroad, 139 Mo. 574; Wischmeyer v. Richardson, 153 Mo. 556. (2) The representations were positive and unqualified concerning material facts susceptible of actual and certain personal knowledge; they were made recklessly and as of knowledge, and defendant not only knew that it did not know them to be true, but made them recklessly and without information sufficient to justify it in forming an

honest belief in their truthfulness, and being false, they were therefore fraudulent.  Buford v. Caldwell, 3 Mo. 355; Dulaney v. Rogers, 64 Mo. 201; Herman v. Hall, 140 Mo. 276; Clinkenbeard v. Weatherman, 157 Mo. 114; Raley v. Williams, 73 Mo. 310; Wickham v. Grant, 28 Kans. 522; Kerr on Fraud and Mistake, pp. 54, 56; Curtis .v. Stilson, 38 Kans. 306; Lynch v. Merc. Trust Co., 18 Fed. 487; Ainslie v. Medlycott, 9 Ves. 21; Brooks v. Hamilton, 15 Minn. 31; 1 Hilliard on Torts, p. 14; 8 Enc. Pl. and Pr., p. 905; Borders v. Kattleman (Ill.), 31 N. E. 19; 8 Am. and Eng. Ency. Law (1 Ed.), 801; Bradley v. Powers (Me.), 42 Atl. 362; Haycroft v. Creasy, 2 East 103; Krause v. Busacker (Wis.), 81 N. W. 407; Fisher v. Mellen, 103 Mass. 506; Bullitt v. Farrar (Minn.), 6 L. R. A. 149; Cabot v. Christie, 42 Vt. 121; 2 Addison on Torts (Wood's Ed.), sec. 1177; 14 Am. and Eng. Ency. Law (2 Ed.), p. 95; Furnace Co. v. Moffatt, 147 Mass. 403; Babcock v. Osmer, 153 N. Y. 608; Kuntze v. Kennedy, 147 N. Y. 130; Moline Plow Co. v. Carson, 72 Fed. 392; Wheeler v. Baars, 33 Fla. 710. (3) The record amply sustains the finding of the court below, that the fraudulent representations were relied upon, and that plaintiff was induced thereby to purchase the note. But the law does not require that the fraudulent representations should have been the sole inducement.  Becraft v. Grist, 52 Mo. App. 589; Cahn v. Reid, 18 Mo. App. 131; Bradleys v. Powers, 42 Atl. 362; Clark on Contracts, p. 345; James v. Hodsden, 47 Vt. 127; Kerr on Fraud and Mistake, p 74; Bish., Non-Cont. Law, sec. 336; Bigelow, Fraud, p. 545.

VALLIANT, J.—This is a suit for damages, founded on alleged fraudulent misrepresentations.  It is what is commonly called an action for deceit.  Plaintiff is a national bank at Rock Island, Illinois; the defendant a Missouri corporation located at Kansas City, and engaged in the business generally conducted by trust companies, which includes the buying and selling

of promissory notes.   The transaction out of which this suit arises was the sale by the defendant to the plaintiff of a promissory note purporting to be secured by a mortgage on two hundred head of cattle in Marion county, Kansas.   The transaction was conducted by letter correspondence through the mail.   The first letter in point of date introduced in evidence by the plaintiff was from the cashier of the American National Bank to the cashier of the plaintiff, which was as follows:

AMERICAN NATIONAL BANK.

Kansas City, Mo., Aug. 20th, 1898.

Mr. C. Hellpenstell, Cashier, Rock Island, Ills.

Dear Sir:—I told you yesterday I would write you in regard to cattle commission firms.  Before giving you a list I will say, while we do not discount the value of a good endorsement, in a good, stiff firm, we figure more particularly on the value of the cattle actually covered by the mortgage in each case, and the general reputation and standing of the farmer or feeder who makes the paper.  As you know this business is not a new thing and the business is as well established in this section as loaning on stocks and bonds in the east.  The different commission houses have their regular line of customers in these farmers and feeders as a bank has in its correspondents; and in this way, being regular customers, we local banks become to know in some measure the value of these individuals, knowing many of them personally.

As regard to the different firms' endorsement we would say that the larger firms are usually on the back of a proportionally larger amount of paper than the firms of smaller capital, so that, in many cases, the paper of the smaller firms are as much in demand as the larger, because the security (number and grade of cattle for a given loan) is as good or better.  However, the mere endorsement of some of the firms here is within itself perfectly good.

[Here follows a list of names of fourteen commission firms, in which is A. J. Gillespie & Co.'s.]

We local banks get a great deal of first class cattle paper from our corresponding banks in the country, especially Kansas, Missouri, Texas, Indian Territory and Oklahoma, bearing their endorsement, which is good paper.

There is plenty of this paper out here for us all, so I will be pleased to do anything for you I can at anytime, by way of advice, selection of it, or even the purchase of it for you, for there are about a half dozen eastern banks that I now buy paper for, and have done so in some cases two or three years.

However, as I told you yesterday, I am a stockholder and di-rector in The Central Trust Company of this city, which is making a business of handling this paper, buying it for itself and also for its connections, and I would be pleased for you to deal with them, unless you have some preference elsewhere. I.will have them write you and submit you offerings, if agreeable. Yours, etc.,

J. R. Dominick.

The first two letters from the defendant were in the nature of solicitations for the plaintiff's ·custom and were as follows:

Kansas City, Mo., Aug. 22, 1898.

Mr. C. Hellpenstell, Cashier Peoples National Bank, Rock Island, Ills.

Dear Sir:—Mr. Dominick, Cashier of the American National Bank, says you buy considerable cattle paper in this market, and suggests that we correspond with you. in regard to it.

We handle a great deal of this paper. In fact we make a specialty of it, buying it for our own use and placing it with our connections. We buy it outright and carry it until it is sold, and when sold we either endorse it or not, as is preferred by the pur-chaser, making a difference of one per cent in the discount rate where we endorse it. We are familiar with the standing of the different commission firms here at the stock yards and are in touch with them and examine carefully all papers taken. Since we have commenced business we have never had a· note to run past due a day.

Our company is now increasing its capital stock to $100,000, $85,000 of which has been paid in.

We carry accounts with the Produce Exchange Trust Company, New York City, American Trust & Savings Bank, Chicago, and American National Bank, Kansas City, to whom we respectfully refer.

At the present time, our discount rate to you would be six per cent without indorsement, or five per cent with it. All paper could be sent to you, subject to inspection, and if not found satis-factory you could return it. When paper matures we would like for it to be sent to us for collection, and remittance would be made free of charge, either direct to you or placed for your credit wher-ever you direct.

We enclose statement of the company from April 11th to June 30th, showing progress made during that time. Since then our business has been equally satisfactory.

Yours very truly,

THE CENTRAL TRUST COMPANY OF KANSAS CITY.

By J. C. Hill, President.

Kansas City, Mo., Oct. 17, 1898.

Peoples National Bank, Rock Island, Ills.

Gentlemen:—We own and offer for sale some choice, well se-cured cattle paper. Said paper is well secured by mortgage on cattle, given by good parties and endorsed by live stock commis-sion houses of this place. We offer these notes with or without our endorsement, making a difference in rate of one-half per cent. We buy the paper on the Stock Exchange here and use our own capital, investing in none but that which we think is perfectly safe; hence, we are willing to back the paper with a slight difference in rate.

In case you wish any investments of this character we will take pleasure in submitting some to you. Should you accept any of our offerings, you can do so with the understanding that if upon investigation you find any of the paper unsatisfactory we will re-place same with other paper satisfactory to you, or we will reim-burse you in full relieving you of the paper and allowing you in-terest for the time you carried it, at rate you take it from us.

Would be glad to do some business with you in this way. Hop-ing to have a favorable reply, I am,

Yours truly,

R. K. Wooten, Jr., Secretary and Treasurer.

Plaintiff made no reply to either of these letters.

On November 14, 1898, defendant wrote the follow-ing:

Kansas City, Mo., November 14, 1898.

We submit below a list of papers and securities which we offer at six and one-half per cent without our guarantee and at six per cent with our guarantee, subject to previous sale. . . .

No. 6. Note of J. S. Baumbaugh, due March 2nd, 1899. En-dorsed by A. J. Gillespie Com. Co., secured by a mortgage on 200 head of 3 year old Panhandle steers, average weight 800 lbs; 600 bu. corn and 300 tons of cane and kaffir corn; cattle are on full feed in Marion county, Kansas. Amount of note $5,200.

Yours respectfully,

R. K. Wooten, Jr., Secy. and Treas.

Without answering that letter the plaintiff had the following correspondence with Mr. Dominick, cashier of the American National Bank, with whom the plaintiff's cashier was personally acquainted:

Rock Island, Ill., November 16, 1898.

Mr. J. R. Dominick, Cashier, Kansas City, Mo.

Dear Sir:—We are in receipt of an offering sheet from The Central Trust Company which I enclose herewith. Should you be able to give the papers No. 2 and No. 6 your moral endorsement would ask you to have the same forwarded to us for discount. Please let us know if you are personally acquainted with any of these, and if not, you are perhaps in the position to recommend to us some good and desirable papers.

Yours very truly,

C. Hellpenstell, Cashier.

Kansas City, Mo., Nov. 17th, 1898.

Mr. C. Hellpenstell, Cashier, Rock Island, Ill.

Dear Sir:—Yours of the 16th is received. I consider the loans selected by you on the enclosed list perfectly good—in fact, I think all the paper offered on the list good. I would not be afraid to accept it myself.

I have, therefore, told the Central Trust Company to forward the paper to you. I think you will find the Central Trust Company nice people to deal with. I know them to be straight and conservative.

At any time you want paper and will write either to them or to me, stating the amounts, the order will be carefully and painstakingly looked after. I am sure I would try to do so.

Yours, etc.,

J. R. Dominick, Cashier.

Mr. Dominick besides being cashier of the American National Bank was a stockholder and director in the defendant trust company and the plaintiff knew it.

The following letters which closed the transaction next passed:

Kansas City, Mo., Nov. 17, 1898.

Peoples National Bank, Rock Island, Ills.

Gentlemen:—We are instructed by Mr. J. R. Dominick, cashier of the American National Bank, that you accept our number 2 and 6 of Nov. 14 offering. We enclose the two notes as ordered, and have discounted the St. Amand & Wyatt note, $7,395.93, at 6 1-2 per cent for 164 days, amount $219, leaving net $7,176.93.

The J. S. Baumbaugh note for $5,200 at 6 1-2 per cent for 104 days $97.64 leaving net $5,102.36. The $5,102.36 and $7,167.93 make a total balance due us of $12,279.29. To cover same please remit Commercial National Bank, Chicago, Ills., for our credit, notifying us of the amount. If it is not convenient for you to remit Chicago, Kansas City Exchange will do us just as well.

We think you will find both nice pieces of paper. We will forward you recorder's certificate against the mortgage of St. Amand & Wyatt as soon as received by us. Both of the original mortgages were filed with the recorder of deeds in the different counties and have the required amount of revenue stamps upon them.

We thank you very kindly for this order and hope to merit a continuation of your favors in this line in the future. We investigate all-paper taken by us thoroughly; invest our own money and do not take anything except that which is well secured and endorsed by good parties.

We will send you our offerings from time to time, and at any time you see fit to accept any of them, you can do so with the understanding that you are to take and pay for same, and are to have a reasonable time within which to investigate and if after thorough investigation you are not satisfied, we will furnish you other paper instead or reimburse you in full, relieving you of the paper, allowing you interest for time carried at rate you take it from us.

Would be glad if you would investigate us that you may know with whom you are dealing. Our correspondents are Produce Exchange Trust Company, New York; Commercial National Bank, Chicago, Ills.; American National Bank, this city.

Yours very truly,

R. K. Wooten, Jr., Sec. and Treas.

Rock Island, Ill., Nov. 19, 1898.

Central Trust Co., Kansas City, Mo.

Gentlemen:—I acknowledge receipt of your favor of the 17th inst., with note of St. Amand & Wyatt, $7,395.93; also note of J. S. Baumbaugh for $5,200 which we have discounted according to your figures. As per instructions we remitted to-day to the Commercial National Bank of Chicago the net proceeds of the same, which was $12,279.29. If you have some extra good papers to offer kindly submit them to us.

Yours very truly,

C. Hellpenstell, Cashier.

The whole transaction is contained in those letters. It turned out that the maker of the chattel mortgage, J. S. Baumbaugh, had never owned any cattle filling the description, and the mortgage was therefore worthless. The maker and endorser of the note became insolvent and therefore the note became worthless.

The evidence showed that notes of this kind, that is, purporting to be secured by mortgages on cattle then in

Kansas and other cattle raising States, were handled in great quantities by the banks and banking concerns in Kansas City. Such paper, called "cattle paper," usually came to the banks through the cattle commission merchants of that city.

The commission merchants had their transactions usually directly with the cattle raisers, and the banks with the commission merchants. The commission merchants, being brought into personal relation with the farmers and the men who raised cattle and brought them to market, came to know the business character and financial standing of their customers. In like manner the banks in their dealings with the commission merchants came to know them and to form an estimate of their business characters. When paper of this kind was offered to the banks for discount they took into consideration the character of the commission merchant who offered it, and that being satisfactory inquired of him concerning the character of the farmer or cattle owner whose note was offered. If the information received from that source was satisfactory the paper was accepted by the bank. In such transactions the banks did not send inspectors out in the county to find the cattle and verify the recitals in the mortgages. The plaintiff bank had been in the habit for sometime before of buying this kind of paper from the banks in Kansas City, and handled a considerable quantity of it.

In this case the note in question accompanied by a duly certified copy of the mortgage was offered for discount to the American National Bank by the A. J. Gillespie Commission Company, a concern with a paid-up capital stock of $100,000, then in good credit, and well known to the bank. The president of that company, who was also well known to the bank, and who had formerly been a banker in Kansas near where Baumbaugh, the maker of the note and mortgage in question lived, and who knew him, informed the bank that he was a farmer and a man of good standing and good character. On

the faith of that representation and the endorsement of the note by the commission company the bank discounted it.

There was a very close relation between the American National Bank and the defendant, the Central Trust Company, all the officers of the bank being directors in the trust company. The bank sold the note to the trust company, and the trust company sold it to the plaintiff. The copy of the mortgage was delivered with the note to the plaintiff.

The evidence showed that Baumbaugh was, as represented, a reputable farmer owning a farm of 160 acres in Kansas, and up to this time his name was untarnished. But he had a son-in-law named Gillett, who was a courageous speculator in cattle, and in whom Baumbaugh seemed to place great confidence. About November 2, 1898, Gillett told Baumbaugh that he was purchasing 5,600 head of cattle in Oklahoma, a part of which he was going to bring to his farm in Kansas and feed them there for market, and requested Baumbaugh to execute certain notes and mortgages securing the same on these cattle to be so placed on his farm. Baumbaugh did as requested without waiting for the cattle to arrive. Gillett took the notes and mortgages, and after having had the mortgages registered according to the law of Kansas, went to Kansas City and placed the notes, with copies of the mortgages, in the hands of the Gillespie Company, to sell, representing to that company that the cattle called for by the mortgages were in place as represented. Gillett was then well known in the trade and up to that time no imputation rested against his name. But Gillett never bought the 5,600 head of cattle, and therefore there was never anything for the mortgages to take effect upon. The officers of the plaintiff bank testified that in buying the note they relied solely on the representation made in the letters of defendant in relation to the security. As against that evidence defendant referred to the letter of plaintiff to the cashier of the American

National Bank dated November 17, 1898, and the reply thereto, and the letter of the cashier of the American National Bank to plaintiff's cashier dated August 20, 1898, which were introduced in evidence by the plaintiff. It was also shown that the plaintiff had received from Mr. Dominick the Dun and Bradstreet reports of the standing of the Gillespie Commission Co.

The case was tried by the court, jury waived. At the close of the plaintiff's case, the defendant asked an instruction in the nature of a demurrer to the evidence, which the court refused, and defendant excepted. After all the evidence was in the court rendered judgment for the plaintiff for the amount of the note and interest. From that judgment the defendant has appealed.

I.   The first point presented in the brief of the respondent is that the record shows nothing for this court to review, because, since it is an action at law tried by the court without a jury and no instructions asked or given, this court can not say on what theory the judgment of the trial court rested; citing, Miller v. Breneke, 83 Mo. 163; Bethune v. Railroad, 139 Mo. 574; Wischmeyer v. Richardson, 153 Mo. 556.

The decisions in those cases are to the effect that in an action at law tried by the court without a jury the appellate court will not weigh the evidence, as in an equity case, but will review only questions of law. There was no instruction asked in this case except one in the nature of a demurrer to the evidence which the court refused.   Exception to that ruling was duly preserved. Therefore the ruling of the court on that instruction is properly before us for judgment.

II.   To judge whether there was any evidence in the case to sustain the cause of action stated in the petition, it will be necessary to bear in mind what the gravamen of the action is.   It is thus stated in the petition: "Plaintiff further states that each and all of said written statements and representations regarding the security

behind said note were wholly untrue and were falsely and fraudulently made and communicated to plaintiff by defendant without any knowledge on the part of defendant as to the truth thereof, and in utter and reckless disregard of the truth thereof, and with the knowledge on the part of the defendant, that it did not know the same to be true, and with knowledge on the part of defendant that the same were untrue.''

The plaintiff does not bottom its case on the mere fact that the representations as to the security were not true, as it would have done in a case arising out of a contract of guaranty, but upon the wrongful conduct of the defendant in making a positive statement which was not only untrue but of the truth or falsity of which the defendant had so little, if any, information that its act in making the statement was reckless and in utter disregard of whether it was true or false, and not only that, but that it was made while the defendant was conscious that it did not know that it was true, and finally, that it was made with a knowledge that it was untrue. In the brief for respondent it is said: ''We direct attention to the evidence showing (1) the defendant made the misrepresentations knowing it was without knowledge of their truth or falsity, and (2) that it had no information sufficient to justify a belief in their truthfulness, and (3) that defendant did not in fact believe the representations to be true. That is the plaintiff's case.''

If, therefore, beyond showing that the statement was untrue, the evidence goes no further than to show that the defendant bought the paper in the market at the usual banking discount, having first taken the care that a bank accustomed to handle such paper usually took to satisfy itself that the security was as represented, and then, without further investigation or further information, sold it to the plaintiff, describing it as it appeared on its face to be, offering to endorse it for a half of one per cent if the plaintiff so preferred, then can it be said that the defendant's conduct in the

transaction is correctly described in the language of the petition above quoted or in that of the counsel for respondent in their brief? Plaintiff charges not a breach of contract, but fraud and deceit. Fraud is a willful wrong. Some writers have undertaken to draw a distinction between fraud in fact and fraud in law, but fraud, under any definition, implies the doing of a wrong willfully. Sometimes without proof of an actual evil purpose the law will imply fraud, but only so in a case where one has been so oblivious of his duty, showing such a disregard for the rights of others, as to make his conduct as bad as if actuated by a desire to do wrong. If it were not necessary in an action of this kind to prove fraud, but only to prove that the representation was untrue and from that fact alone to draw the presumption of fraud, then there would be no difference in the character of proof required to sustain an allegation of the breach of a contract of guaranty, and that required to sustain an allegation of the breach of the duty to deal honestly; and in a case like this the averments in the petition above quoted would be unnecessary. But the plaintiff did not risk its case on a statement of facts which would leave the inference of fraud to be drawn only from the making of a false representation; there were other statements to the effect that the representation was made fraudulently with knowledge on defendant's part that it was untrue or with such willful ignorance that it was as bad as guilty knowledge. Those were necessary averments in the petition, and it is necessary to the plaintiff's case that they be proven. Yet according to the plaintiff's view of the law the allegations of fraud are sustained chiefly by a presumption to be drawn from the fact that defendant made the statement without knowing it to be true. The plaintiff's legal proposition is stated in its brief in this form: "To state what is not known to be true is just as criminal in the eye of the law as to state what is known to be false." If the proposition is to be literally

applied, then every statement not true, is criminal, because one can not know a statement to be true unless it is true; therefore, if a statement is not true, the man who makes it is guilty, however strong his belief in its truth may be, and however much reason he may have had for believing it to be true. The plaintiff's proposition, therefore, can not be adopted as an invariable rule. Under some circumstances it is as criminal to state what is not known to be true as it is to state what is known to be false, but under other circumstances it is not so.

The language above quoted in the brief for respondent is from the opinion in Buford v. Caldwell, 3 Mo. 477. In that case the defendant had sold some land to the plaintiff and had, during the negotiations, pointed out to the plaintiff certain houses and other improvements, and represented that they were on the land he was offering to sell, which proved to be untrue. The court said: "It may be reasonably presumed that Caldwell, before he built his house or cleared his field, ascertained the lines of the survey, and should have been trusted in representing that they had been made upon the tract, and were included within the lines of the tract of land sold to Buford. A man of ordinary prudence would have ascertained the truth, and the law will presume that he had done so. Under such circumstances, to state what is not known to be true, is just as criminal in the eye of the law as to state what is known to be false. . . . But of a thing equally known to both parties, or about which both parties had equal means of information, and in regard to which they are equally negligent, neither law nor equity will afford relief."

What is said in that case can not be construed to mean any more than that if the facts are of such a nature as that a man is presumed to have personal knowledge of them and is presumed to know that the person with whom he is dealing relies on him for information, he is as guilty if he makes a false representation concerning

the matter, when he is conscious that he knows nothing about it, as he would be if he should state what he knows to be untrue. The wrong in such case consists in willfully pretending to know and leading one to believe that he does know and to trust in such belief. Such conduct is fraudulent. But to bring this defendant within the doctrine of that case the evidence must show that the nature of the transaction was such that the defendant would be presumed to have personal knowledge of the truth or falsity of the statements contained in the mortgage, and that the plaintiff had a right to believe that the defendant had such knowledge. The evidence showed that paper like this, cattle paper, was handled in large quantities by the banking concerns in Kansas City, that they took it on the faith of the names it bore and of the men who offered it for sale and never sent out messengers to Kansas, Texas and elsewhere, to round up the cattle and verify the statements in the mortgages. In its very nature the cattle business could not be handled by the banks in any other manner. If every note of this kind offered for discount had to wait until a messenger could be sent to the distant States to verify the mortgage, the business would cease. The banks did not conduct this business in that way. The plaintiff bank must have known how the business was conducted because it dealt largely in such paper in that market.

Therefore, when the defendant in its offering sheet described the Baumbaugh note as secured by mortgage on 200 head of cattle, the nature of the case forbade the presumption that the defendant was undertaking as of its own knowledge to verify the truth of that statement and no one knew better than the plaintiff that no such personal knowledge was implied and no such verification intended. The offering sheet was only designed to describe the paper as it purported to be, and the plaintiff presumably knew it.

In Dulaney v. Rogers, 64 Mo. 201, relied on by re-

spondent, the defendants had given an insolvent and irresponsible man a certificate to be by him used in soliciting credit in business, in which certificate it was said that the bearer was in every way responsible and a good business man. This court approved an instruction which directed the jury to find for the plaintiff if they found that the defendants represented that they knew the man to be responsible when they were aware of the fact that they did not know whether he was solvent or insolvent. The representation in that case was of a character that indicated that the defendants were speaking of their own knowledge and the certificate was designed to be presented to strangers. The court there says that, when a man gives a certificate of that kind, either knowing it to be false or not knowing whether it is true or false, the *scienter* is established. But the court in that connection said: "An innocent misrepresentation made through mistakes, without knowledge of its falsity and with no intention to deceive, can not justify a personal action for damages."

Hamlin v. Abell, 120 Mo. 188, is also relied on as a support for plaintiff's proposition. But the facts of that case distinguish it from this. The representation there made was that the notes offered for sale were well secured by collaterals, when in fact there were no collaterals. The usual mode of business of banks and brokers handling commercial paper secured by collateral, is that the collateral accompanies the paper offered for discount and is delivered with it when accepted. The personal knowledge, therefore, that a bank or broker would naturally be presumed to have in regard to collateral securing such paper is very different from that which a bank would be presumed to have in regard to the actual existence of cattle in a distant locality called for in a mortgage.

We have nothing to take back from what was said by this court in those cases; the law was correctly declared as applied to the facts then being considered, but

this case does not fall in the same category. The defendant was offering for sale commercial paper of a character well known in the market, offering it to a concern that was accustomed to buying that kind of paper in that market and that knew or is presumed to have known the custom of the trade in relation thereto; under those conditions the plaintiff had no right to think that defendant knew anything more about the mortgage than that it purported to cover 200 head of cattle, and that it came into defendant's possession in the usual way, bearing names that gave it credit, that defendant had exercised the care that a prudent and experienced banker under the same circumstances would have exercised, had in good faith invested its own money in it, and had offered it for sale without any suspicion that it was not as it purported to be. The law has never placed the brand of fraud and deceit on such conduct. There is nothing in the conduct of this defendant as shown by the evidence that was not straightforward, honest and businesslike.

The court erred in refusing the instruction asked by defendant in the nature of a demurrer to the evidence. The judgment is reversed.

All concur.