## RAY COUNTY SAVINGS BANK v. THOMAS S. HUTTON, Appellant.

### In Banc, November 29, 1909.

1. **OBJECTIONS: No Ruling: No Exceptions.** Objections to the admission of evidence, upon which the court at the time did not rule, announcing that he would pass upon them when he passed upon the case, to which failure to rule at the time no exception was saved, cannot be considered on appeal.

2. ———: **General: Deposition.** If there is any proper testimony in a deposition a general objection to the whole is bad.

3. **ABSTRACT: Printing Whole Bill.** If appellant print the whole bill of exceptions, respondent cannot complain. Rule 17 permits the printing of the whole record in lieu of an abstract.

4. ———: **Certified Copy of Judgment.** The abstract is not bad because it does not show that a certified copy of the judgment and order of appeal was filed in the Supreme Court. The court will read into the abstract such certified copy originally filed here.

5. ———: **Motion for New Trial: Filed During Term.** The court will take judicial notice of the commencement of terms of court. And where the abstract shows the motion for a new trial was filed within four days of the judgment, and that an order was made on said day "by said court, reciting a filing of said motion for a new trial" and the motion was "continued to

the April term," and the court judicially knows the April term was the next term, it will be held that the court was in session and had not adjourned in course, and that the motion was filed during the judgment term.

6. ————: **Bill of Exceptions: Signed by Judge.** The signature of the judge, settling and approving the bill of exceptions, should appear at the end of the bill, and nowhere else. That is not matter of record proper. The abstract in this case shows the bill of exceptions was signed by the judge.

7. **BRIEF: Respondent's.** The form of respondent's brief is not of substance on appeal; and though it is not constructed in accordance with Rule 15, it will be considered, although appellant's brief in the same form would be discarded.

8. **FRAUD: Knowledge.** Where the company payee of the note was not in an insolvent condition at the time it was indorsed to the bank, and the facts make it clear that defendant, who was the cattle company's ranking executive officer, had no part in renewing the chattel mortgage securing the note after the property covered by it was no longer available, and did not know that fact, an allegation that he induced the bank to buy the note with intent to cheat and defraud, is not sustained by the proof.

9. ————: **Promise to Pay.** A promise in a letter to the bank inclosing the note for discount, that it would "be promptly met at maturity," is not an element of fraud, nor a bit of color painting the fraud a darker hue. A promise to pay a debt when due is not an element of actionable fraud.

10. **FRAUD AND DECEIT: Scienter.** In an action for fraud and deceit, the *scienter* is an indispensable element. If the vice-president of the cattle company did not have guilty knowledge that a narration in a stockman's note given to the company that the note was secured by chattel mortgage on cattle was false, his letter inclosing the company note to the bank for discount, and reciting that "all these notes are renewals, except one, for which ample provision is made in our form of mortgage," does not make a case of fraud and deceit.

11. ————: ————: **Untruths for Knowledge.** The words "for which" in the letter, refer to renewals, and the meaning is that ample provision is made in the form of mortgage in use for renewal notes. And the statement was literally true, and did not amount to a fraudulent representation that the narration in one of the notes that it was "secured by chattel mortgage on 1,180 head of cattle" was true. Nor can the letter and note taken together be held to be a fraudulent representation that the note was secured by a chattel mortgage on 1,180 cattle.

Bank v. Hutton.

12. ———: **Discounting Note: Representation of Its Narration.**
The representations made by the makers in their note that it
was secured by a chattel mortgage on 1,180 head of cattle do
not in law become the personal representations of the vice-
president of the payee company when he transmits the note to
a bank for discount.

13. ———: ———: ———: **What Its Narrations Mean: No-
tice.** The note, dated April 29, 1903, was for $6,048.01, and
recited: "This note is given in renewal of unpaid indebtedness
secured by a chattel mortgage on 1,180 cattle, given by us to
Strahorn-Hutton-Evans Commission Company, dated September
21, 1901, filed for record at Ardmore, Indian Territory, on the
27th day of September, 1901. Kate Huntley, by W. M. Huntley,
Agt.; W. M. Huntley. Post-office, Rush Springs, I. Ty." A
reference to the mortgage would have revealed that the or-
iginal note was for $20,000, and that it covered 1,180 cattle
and their natural increase, and made provision for marketing
the cattle as they reached marketable condition. This note was
sent in a letter, written by a trusted employee, and signed by
defendant as vice-president of the Commission Company, to
plaintiff bank for discount. The bank did not investigate the
mortgage, asked for no explanations and none were made. The
Commission Company having failed, the bank sues defendant as
for fraud and deceit. *Held*, that the note does not represent
that there were at the time of the renewal 1,180 cattle covered
by the mortgage. The bank had notice that more than two-
thirds of the original indebtedness had been paid, that one year
and eight months had come and gone since the original note
and mortgage were made, and also had notice that the number
of cattle would be reduced by shipments and other things.

14. ———: ———: ———: **Scienter: From Company's Books:
Trusted Employee.** Nor will the defendant, because he signed
said letter as vice-president of the commission company, written
as it was by a trusted employee, who had actual knowledge
and who had large charge of the business in his extensive
absences, be held to have had actual knowledge that none of the
cattle covered by the mortgage were available, simply because
the company's books showed that fact; and of course there
could be no such holding where the books, as in this case, did
not show such fact.

15. ———: ———: ———: ———: **Reckless Statement.** In
an action for fraud and deceit the plaintiff must prove actual
fraud. Fraud is proved when it is shown that a false repre-
sentation has been made knowingly, or without belief in its
truth, or recklessly, without caring whether it be true or false.
A false statement, made through carelessness and without

reasonable ground for believing it true, may be evidence of fraud, but it does not necessarily amount to fraud. Such a statement, if made in the honest belief that it is true, is not fraudulent, and does not render the person making it liable to an action of deceit.

16. ————: **Agent: Respondeat Superior: Non-feasance.** An agent is not liable to third persons for mere negligence in nonfeasance. In such case his master must answer. But no agent masquerading under the cloak of a corporate name may escape liability for actual fraud working an injury to third persons.

17. ————: ————: **Ex Contractu: When They Become Ex Delicto.** The general rule is that in matters *ex contractu* a third person dealing with the known agent of another, whether that other be a person or a corporation, is deemed to deal, not on the credit of the agent, but on that of the principal. If that rules does not obtain in a given case it is because fraud avoids the rule, and thereby the door of liability swings open to an action *ex delicto*.

18. ————: **Proof.** Fraud is commonly hid, is scarcely ever proved by admissions, and is often to be established by putting seemingly indifferent things together. Nevertheless, actual fraud is a malevolent and wilful act, and the difficulty of proving it does not dispense with the necessity of proving it.

19. ————: **Deference to Trial Court: Writings.** The trial court occupies no position superior to the appellate court in interpreting writings; and where fraud is predicated upon written narrations in a note and letter, the appellate court will put its own interpretation upon them.

Appeal from Jackson Circuit Court.—*Hon. Jas. H. Slover,* Judge.

REVERSED.

*Botsford, Deatherage & Creason* for appellant.

(1) An agent of a principal is never liable to a third party except where the case reveals on the part of the agent facts and circumstances of actual, positive and intentional fraud and deceit. There is not a particle of evidence in this case to show actual fraud or deceit on the part of defendant Hutton. O'Neill v. Young, 58 Mo. App. 628; Thompson v. Irwin, 76

Mo. App. 418; Buis v. Cook, 60 Mo. 391; Fusz v. Spaun-horst, 67 Mo. 256; Bank v. Hill, 148 Mo. 380; Dederick v. Bank, 100 Tenn. 457; Utley v. Hill, 155 Mo. 232. (2) It is the settled law in Missouri that in actions of this kind if the defendant who made the representation charged had reason to and did believe it to be true, he has incurred no liability. The gist of this action is actual fraud. Bank v. Sells, 3 Mo. App. 85; Arthur v. Mfg. Co., 13 Mo. App. 335; Koontz v. Kaufman, 31 Mo. App. 397; Florida v. Morrison, 44 Mo. App. 529; Sanders v. McClintock, 46 Mo. App. 216; Green v. Worman, 83 Mo. App. 568; Edwards v. Noels, 88 Mo. App. 434; Lovelace v. Sutter, 93 Mo. App. 429; Mc-Cauley v. Brown, 99 Mo. App. 625; Dulaney v. Rogers, 64 Mo. 201; Anderson v. McPike, 86 Mo. 294; Wad-dington v. Loker, 44 Mo. 132; Funkhauser v. Lahy, 78 Mo. 458; 14 Am. and Eng. Ency. Law (2 Ed.), 203; Smith v. Bolles, 132 U. S. 125; 14 Am. and Eng. Ency. Law (2 .Ed.), 63-177; Stevens v. Rainwater, 4 Mo. App. 292. (3) None of the averments of fraud in this case against defendant are proven. In the considera-tion of this case, we call the court's attention to the leading case of Derry v. Peek, 14 App. Cas. 337. That celebrated case was decided by the House of Lords in England in 1889. The opinions in the case were given unanimously by the judges who sat in the case. The principal opinion, however, in the case was de-livered by Lord Herschel, commencing at page 359. We cite this case because in the summary of it it has received the approval of our Supreme Court in the case of Bank v. Byers, 139 Mo. 653. The judgment in the case of Derry v. Peek has been approved by others of our American courts. Nash v. Ins. & Trust Co., 163 Mass. 574; Kountze v. Kennedy, 147 N. Y. 124; Donnelly v. Trust & Guaranty Co. (Md.), 61 Atl. 301. The doctrine of that case has become the settled law wherever it has received consideration. The doctrine of Vose v. Grant, 15 Mass. 505, has also been approved

by our Supreme Court in Fusz v. Spaunhorst, 67 Mo. 256. (4) The propositions of this brief are also supported by Pomeroy, 2 Eq. Juris. (3 Ed.), secs. 881, 886, 888. See also: Bank v. Trust Co., 179 Mo. 648; Boddy, v. Henry, 113 Iowa 462; Webb v. Rockefeller, 195 Mo. 57; Priest v. White, 89 Mo. 609.

*J. L. Farris, Jr.,* and *J. S. Rust* for respondent.

LAMM, J.—Suit for fraud and deceit. Defendant was vice-president of a corporation known as "Strahorn-Hutton-Evans Commission Company." It will be called the "Company." Plaintiff will be called the "Bank." The bank bought at a discount from the company a note known as the Huntley note, for which it paid $5,856.49. Failing to collect from the payors or the indorser (the company), the bank sues to recover that sum from defendant. A jury being waived, the court gave judgment for $6,882.07—filing the following memorandum: "While a decision for the plaintiff in this case must *necessarily result in great hardship* to the defendant, yet it is the duty of the court to declare the law as announced by the Supreme Court of the State, and under the facts and the law as thus declared the judgment must be for the plaintiff."

From that judgment, defendant appeals.

The pith of the petition is that the bank was doing a general banking business at Richmond; that the company had an office in Kansas City, Kansas, under the control of defendant, one of its executive officers; that the company on May 26, 1903, "was in a failing condition, all of which was well known to said T. S. Hutton;" that in September, 1901, William M. and Kate Huntley were the owners of 1180 head of cattle ranging near Rush Springs, Indian Territory, and executed a chattel mortgage on them to secure to the company their notes aggregating about $20,000; that subsequently such shipments were made of said cattle to the

company that "on the — day of December, 1902," the cattle were reduced to 545 head; that on said day in December, the company took possession of said remnant and sold them to one Peery who, in turn, executed a chattel mortgage on certain cattle, including said remnant, to secure his note to the company for $12,-041.65; that all security was thereby withdrawn from the Huntley chattel mortgage; that the Huntleys were then and are now insolvent; that afterwards on the 29th of April, 1903, said company "by direction of the defendant, well knowing that the security originally given by the chattel mortgage . . . was no longer available and had been exhausted either by sale, death, theft or by straying of cattle away, and with intent to cheat and defraud, did procure from William M. Huntley, acting for himself and as agent for Kate Huntley, their certain promissory note"—a renewal note; that "defendant, for the purpose of selling said renewal note to plaintiff, falsely and fraudulently represented . . . that said note was secured on 1180 head of cattle" by its form of chattel mortgage, "and falsely and fraudulently pretended that said cattle were then at or near Rush Springs, Indian Territory, and subject to said mortgage, all of which was untrue." These false and fraudulent representations are alleged to have been made by a letter of date May 26, 1903. The recitals in the note are then set forth, one of them being: "That this note is given in renewal of unpaid indebtedness, secured by a chattel mortgage on 1180 head of cattle, given by (Kate Huntley, by W. M. Huntley, agent, and W. M. Huntley) to Strahorn-Hutton-Evans Commission Company, date Sep. 21, 1901, filed for record at Ardmore, I. Ty., on 27 day of Sep., 1901."

In connection with that recital in the note inclosed with defendant's letter, it is charged that several other notes were sold to the bank at the same time and that the letter states as follows: "You will note that all

these are renewals except one note, for which ample provision is made in our form of mortgage, and all this paper will be met promptly at its maturity.''

It is next charged that by such statement in said letter, ''defendant fraudulently intended to cause plaintiff to believe and did cause plaintiff to believe that said note was a renewal of unpaid indebtedness'' secured on the 1180 cattle as recited in said note. It is next alleged that the bank relied on such fraudulent and false representations, pretenses and statements contained in said note ''and set forth in said letter'' and, believing the same to be true, bought said note ''at the request of defendant and at his request paid'' said sum therefor; that shortly thereafter the company ''proved to be insolvent, and was at the time of said purchase and now is insolvent, which fact was and is well known to defendant.''

The answer was a general denial.

I. Error is assigned in admitting testimony. When plaintiff offered the deposition of one Huntley, counsel objected to the whole of it upon the ground that matters testified to by him are conversations with one Peery and the transactions between him and Peery are hearsay in character, etc. Then, this from the court: ''I will pass upon the objections to the deposition when I pass upon the case.'' At the conclusion of the reading of the deposition counsel moved to strike it out for the same reason. When the deposition of one Harness was read, this from counsel: ''I want to make the same objection that I made to the deposition of W. M. Huntley;'' and after Harness's deposition was read, this: ''I would like to interpose this same objection to all other depositions and the same motion at the end of each.'' And when the deposition of one Burke was offered counsel said: ''The same motion at the beginning and end as made to other depositions.'' The record does not disclose any ruling made

except the judge's promise to pass on objections and case together. We do not find that counsel objected or excepted to that course, or that any ruling was made subsequently on these objections, or that when judgment was rendered there was any exception to the failure to rule as promised.

Under such circumstances the assignment cannot be considered. This because: (1) In the first place, we are prohibited by statute from allowing an exception here not expressly decided below. [R. S. 1899, sec. 864.] (2) In the second place, even if we (*ex gratia*) should construe the judgment as, in effect, an adverse ruling on the objections and motions, yet such ruling would be correct because of the general form of objections and motions. If there be any proper testimony in a deposition a general objection to the whole is bad. In like case a motion to strike out is bad. Now, there was matter in all these depositions objectionable as hearsay and conclusions, but there were none not containing some proper testimony. Learned counsel should have segregated the good from the bad, leveled their objections specifically at the bad, earmarking it in some distinguishable way, obtained a ruling and excepted to that ruling; or, failing to get a ruling, objected and excepted to such failure to rule. This they did not do.

There are other objections to testimony which, in the view we take of the case, need no attention.

The point is ruled against defendant.

II. It is insisted the abstract is fatally defective as follows:

(a) In that it does not show that the motion for a new trial was filed during the judgment term.

(b) Nor that the bill of exceptions was signed by the judge.

(c) Nor that a certified copy of the judgment and order granting an appeal was filed here.

(d)   And that appellant failed to comply with our rules 11 and 13.

As we grasp the gist of point *d,* it is a criticism on printing the *whole* bill of exceptions instead of making an abstract. But if the whole be printed, respondent cannot complain. The burden of such volume of record is on this court, not on respondent, in the first instance, and by rule 17 (whether wisely or not) we permit the printing of the whole record in lieu of an abstract.

Point *c* is covered by our ruling in Coleman v. Roberts, 214 Mo. 634, and State ex rel. v. Smith, 172 Mo. l. c. 458. We there, in effect, ruled that we would read into the abstract the certified copy of the judgment and order granting an appeal originally lodged here. Such certified copy was filed in this case. The point is disallowed to respondent.

The same disposition must be made of points *a* and *b*. This because we will take judicial notice of the sitting of the Jackson Circuit Court at terms prescribed by statute—*i. e.,* when its terms commence. The record shows that the motion for a new trial was filed within four days of the judgment. From the date of its filing we judicially know it was not at the next term after judgment. The question then is: Had the court risen for the judgment term until court in course —was it in vacation when the motion was filed? The record affirmatively shows it was not in vacation. We find the following in the abstract of the record proper: "An entry of an order was made of record on said day *by said court* reciting the filing of said motion for a new trial." The record proper shows that the motion for a new trial was "continued" to the April term. The April term, we judicially know, was the next term after the date of the filing of the motion. When the abstract narrated that "said court" entered an order reciting the filing of the motion and "continued" the motion, those orders, *ex vi termini,* presuppose the

court in session and exclude the idea of vacation. If the court was in session it was bound to be at the judgment term or at the next term. We know it was not the next term, *ergo* (by exclusion) it was the judgment term—*quod erat demonstrandum.*

Touching the signature of the bill of exceptions: We find in the record proper the following: "defendant filed his bill of exceptions in said cause . . . and the said court then made and entered of record in said cause an order reciting the filing of said bill of exceptions . . . and said order further recited that said bill of exceptions be and the same was thereby made a *part of the record* in this cause." We find, moreover, that the signature of the trial judge is shown to be actually subscribed at the end of the bill. We do not agree with respondent's counsel that a showing of the signature of the judge at the *end* of the bill stands on the same footing as narrations *in* the bill of record proper not belonging there. His signature belongs at the end of the bill and nowhere else. Record proper does not belong in the bill but belongs elsewhere and those cases ruling to that effect are not pertinent to the point now up.

When an abstract asserts that a court of general jurisdiction solemnly made a bill of exceptions a part of the record of a cause, certain necessary implications are read into that matter. Such court is presumed to proceed by right and not by wrong, and its action is presumed to be preceded by all antecedent steps making the action legal. The bill of exceptions could not legally be made a part of the record without it was settled, allowed and signed by the judge. Therefore, when the court made it a part of the record it is equivalent to a statement that the proper precedent steps were taken to authenticate the bill and make it worthy of becoming part of the record.

The rules of this court are not administered except with reason. It would be self-stultification for us

to apply reason to the administration and interpretation of substantive law and to ride off on a dry and narrow interpretation, devoid of reason, when dealing with our own rules.

The point is disallowed to respondent.

And in disallowing it we shall mete out the same liberality in considering respondent's brief. That brief, a paper book of 81 pages, is earmarked with industry and vigor, but is not constructed in accordance with rule 15 of this court. [Sullivan v. Holbrook, 211 Mo. 99.] From end to end it is a running commingling of facts, points and authorities, comment and argument, without distinguishing between one and the other. If such brief had been filed by appellant it would be discarded for appellate purposes under rule 15. This, because appellant carries the burden of showing error in the judgment. A respondent, however, can submit his cause without any brief if he so elect. In that condition of things, it is manifest that the form of respondent's brief is not of substance on appeal. Therefore, we will consider it.

III. No instructions were asked for plaintiff. One was asked for defendant and that in the nature of a demurrer. It being refused, defendant excepted. A proper consideration of that demurrer seeks the facts and determines the main proposition in the case.

In substance, the case on the facts is this: The Strahorn-Hutton-Evans Commission Company is a domestic corporation organized in 1895 and, until becoming insolvent in 1903, it had branch offices at Chicago, Illinois; East St. Louis, Illinois; Kansas City, Kansas, and Fort Worth and San Antonio, Texas. Each of those offices was in charge of an executive officer. During the times in hand Mr. Strahorn had charge of the Chicago office; Mr. Evans of that in East St. Louis; Mr. Simpson of that in Kansas City, Kansas, until January, 1903; and during the years 1900-01-02

up to January, 1903, defendant Hutton had charge of the two in Texas, he residing at Fort Worth.

The proof is all one way that Hutton had no charge or knowledge of the details of the business of the company at the Kansas City office for several years before January, 1903, but that such business affairs were in charge of Mr. Simpson, vice-president, as general manager. In January, 1903, Mr. Simpson sold out his large holding of stock in the company at 50% above par. At that time the undisputed testimony discloses that a Mr. Todd took his place as manager of the Kansas City office and was in charge on May 26, 1903. Whether Todd had been connected with the company there and familiar with the details of the business at that office is not shown; but as Hutton came from Texas and was absent much in 1903, it is fair to presume that Todd was put in as manager because of his familiarity with existing details of the business and because Hutton had not the details in hand and his time (as shown by the proof) was largely taken up elsewhere.

The company was capitalized for $200,000. It had a declared surplus of $100,000 in January, 1903, and its books showed an undivided profit at that time of an additional $60,000. It was doing a commission cattle business—buying and selling cattle on commission and on its own hook and loaning money on cattle (as well as to cattle dealers without security), widely over Missouri, Kansas, Oklahoma, Indian Territory and Texas. Its credit from 1895 to October, 1903, was A 1, but one or two cattle companies ranking commercially stronger.

In June, 1903, there was a heavy slump in the price of cattle. There is some evidence that the Southwest was afflicted with drouth, but, from whatever cause, cattle depreciated fifty per cent. The holders of cattle paper became uneasy. A panic grew and rapidly spread in the cattle business. Paper was called in by holders. Renewals were refused to cattle men. The marked dropped. Unable to weather the storm, in Oc-

tober, 1903, the company went to the wall. The unquestioned evidence locates the first time that facts tending to show the insolvency of the company became known to the defendant and the management of the Kansas City office, and that was in October, 1903, or right at that time. Mr. Hutton even then believed in the solvency of his company. He had $61,000 of his personal funds on deposit with it and had long carried with it a heavy fluctuating deposit. He checked out none of it, though entitled to do so, and every dollar of it was lost in the wreck. Before going into the history of the Huntley paper it may be well to point out that the record shows that the company sold its paper to banks and investors. It had one form of note, a sample of which will presently appear, which was for renewals and referred to the fact that it was in renewal of unpaid indebtedness secured on cattle by chattel mortgage recorded at a certain specified point on a given date. When such renewals were made new mortgages would not be taken, but, to keep track of the transaction and connect the renewals with the original notes and the original mortgage, the renewed notes referred to the indebtedness secured by the original mortgage. It had another form of note not referring to chattel mortgages. When the company discounted paper to banks it always indorsed such paper and, until it fell over the brink of insolvency, it protected its paper. Early in its corporate career the company opened up a line of discounts with plaintiff bank, indorsing over to it both secured and unsecured notes. The volume of such business with the bank covering a few years before May, 1903, was between $100,000 and $200,000. During that time the unsecured paper discounted with the plaintiff bank was the rise of $60,000.

During its whole business dealing with the company the bank in purchasing paper never got any chattel mortgages, its officers never saw any, and never demanded any until after the insolvency of the company

in October, 1903. There is no indication in the record that it knew or cared to know the whereabouts of the cattle men whose paper it bought from the company, or inquired about the financial standing of payors of notes, or located and examined any cattle. There is a bit of testimony that it at one time held some unsecured paper of a man named Casey of Clinton, Missouri, and instituted an inquiry into his solvency, but in the long and heavy line of discount with the company that is the only specific instance of inquiry disclosed. The ordinary course of dealing was that when the paper matured it was sent to Kansas City for collection and there presented to and paid by the company as indorser, the indorser being treated as the paying party in the first instance. When taken up by the company, as indorser, it then dealt directly with the original payor. There is testimony, rather faint, that at an unknown time before the bank bought the Huntley note, its president was advised by an undisclosed party to take paper secured by cattle when dealing with the company. At some time not disclosed its president made an inquiry of the defendant for mortgage paper, but was informed that the company had none at that time and nothing came of the talk. As will appear presently the negotiation resulting in the purchase of the Huntley note was not between defendant and the president of the bank, but between Mr. Seymore, the cashier of the bank, and Todd, the Kansas City manager of the company.

On the 25th of May, 1903, Seymore under instructions from the bank and as its cashier, appeared at the Kansas City office of the company and opened and conducted negotiations for six notes. There seems to be no dispute but what the negotiation was carried on with Todd and that the defendant was not a party to any of its details. As the result of that negotiation Todd dictated a letter under date of May 26, and that letter was brought to the defendant and signed

by him as a matter of course in the usual routine of business when he was on the ground and the acting ranking resident executive officer. The testimony shows conclusively, we think, that defendant signed the letter prepared for him in reliance on the good faith of those who dictated it and had no personal knowledge of the facts it contained or of the history of the Huntley note. Mr. Hutton testified, and there is nothing to dispute his testimony, either directly or inferentially, that he had no such personal knowledge. The letter of May 26 follows: .

*"Strahorn-Hutton-Evans Commission Co.*
*"Live Stock Agent.*
"Kansas City, Kansas, May 26, 1903.

"The Ray County Savings Bank,
  "Richmond, Mo.

"Dear Sirs:

  "In line with request of your Mr. Seymore, who called on us yesterday, we now enclose you herein, for discount, the following paper:

| | | | | | | |
|---|---|---|---|---|---|---|
| " M. L. Trout. | . . . .$2611.85 | Due Aug. | 25 | Dis. | $ 39.18 | Net $2572.67 |
| J. W. Odom. | . . . . 904.65 | Oct. | 1 | | 19.15 | 885.50 |
| E. L. Brewster | . . . . 1032.95 | Oct. | 1 | | 21.86 | 1011.09 |
| Bonner & Lind. | . . . . 1942.37 | Nov. | 6 | | 52.77 | 1889.60 |
| C. G. Graham | . . . . 2201.15 | Nov. | 6 | | 59.79 | 2141.36 |
| K. & W. Huntly | . . .6048.01 | Dec. | 3 | | 191.52 | 5856.45 |

$14356.71

for which amount you may remit us in Kansas City Exchange, provided you find our extensions correct and satisfactory.

  "You will note that all these are renewals except one note, for which ample provision is made in our form of mortgage, and all this paper will be met promptly at its maturity.

"Thanking you, and hoping to hear from you whenever we can serve you at this end of the line in any manner, we are,      Very truly yours,

"(Encls.)      T. S. HUTTON, V. P."

The notes listed were discounted at once by the bank in accordance with figures shown in the last column. All of them were paid except $100 on the Lind note and the whole of the Huntley note. The president of the bank testified that the Huntley note was discounted on the strength of the representation made in the note and letter that it was secured on cattle.

Going back to the inception of the Huntley paper it seems the indebtedness originated in 1900. It then amounted to $26,000, and was secured on 1400 steers, cows, heifers, calves and bulls. The Huntleys lived in Indian Territory, the cattle were there and the business dealing was with the Kansas City office. Such things happened in connection with that deal that in September 21, 1901, the remaining cattle were rounded up on the range, counted and a new mortgage given to secure a reduced indebtedness, to-wit, $20,000, on 1180 head. That mortgage was taken under direction of Mr. Simpson, in charge of the Kansas City office, and of Mr. Peery, the company's field man in the Indian Territory, and is the one in question. On dates immaterial here in 1901-02 certain shipments were made of the mortgaged cattle then marketable and the proceeds credited on the indebtedness. In December, 1902, something of a crisis seems to have been reached in the Huntley transaction. Mr. Peery, acting under orders of Mr. Simpson, opened up negotiations with W. M. Huntley to bring the cattle in to be surrendered under the mortgage then due. The record is silent as to where the Huntley paper then was. It shows that Mr. Peery did not have it. There is testimony that the books of the company were destroyed by a

flood, but just when, what books and for what years does not appear. Huntley brought in and surrendered the rise of 500 head. These cattle were received by Peery on behalf of the company, were then bought by him from the company at the rise of $12,000, for which Peery gave his note and a new mortgage in his own name, and this amount was also credited on the Huntley paper. There is a dispute on some of the facts relating to the surrender of the cattle to Peery by Huntley. Huntley testified that several hundred head of the cattle had died and some had strayed off over the open range. There is some evidence that cattle thieves plied their nefarious trade at that time and place in the Indian Territory. Huntley also testified that Peery promised on behalf of the company to return all his paper if he would surrender the cattle, and while he states that all of the cattle he then could find were turned over to Peery, yet there were a few head he afterwards found and turned in. Peery denies that he had any authority to surrender the Huntley paper and denies that he made any such promise. We think it may be taken as proved that the Huntleys at that time in December, 1902, were insolvent and have ever since remained insolvent, but it is not pretended that defendant had personal knowledge of that insolvency before May 26, 1903. Peery testified that he was not impressed with the fact that the cattle were all turned in. There was testimony that the Huntley herd was a breeding herd—"she stuff," bulls and steers and yearlings. The number of cattle shipped out of the herd, added to the number turned over to Peery in December, 1902, leaves many cattle unaccounted for. Huntley accounts for them by death, and possibly straying and theft. Peery leaves the matter this way: a large number of cattle were not turned over that should have been on hand and his testimony bears the construction that he was under the belief that they might yet be recovered. He made some effort to fin

more cattle but it was unavailing and to this day none have been discovered and none heard of except a very few.   There is nothing in the record to show that the defendant personally had aught to do with the surrender of the cattle to Peery in December, 1902.   There is no testimony that he had personal knowledge of Simpson's action and Peery's performance in that regard.   The most that can be said is that if the company's books showed the number of cattle shipped by Huntley out of the mortgaged herd and the number bought by Peery out of the same herd, it seems there would be a number of cattle left somewhat proportionate to the amount of the remaining indebtedness shown by the books, if allowance be made for the usual percentage of increase of calves.   If on the other hand the books of the company showed that the cattle got by Peery were a remnant and all that could be found then a different situation might exist.   But the showing made by these books is not here, nor was there satisfactory testimony as to the course of business in the bookkeeping in that behalf.

On the 29th of April, 1903, Peery acting under the directions of Todd, demanded a renewal of the balance left on the Huntley paper, and at that time Huntley, under protest, he says, but not under protest, Peery says, executed the following note which is the note negotiated a few weeks later to the bank:

"$6,048.01      Kansas City, Kan., April 29th, 1903.

"On December 3rd, 1903, after date, without grace, I, we or either of us, promise to pay to the order of Strahorn-Hutton-Evans Commission Company, at its office at Kansas City Stock Yards, Kansas City, Kansas, six thousand forty-eight and 01-100 dollars for value received, with interest at the rate of ten per cent per annum from maturity until paid and ten per cent on the entire amount as attorney fees if placed in the hands of an attorney for collection or suit is d thereon.

"This note is given in renewal of unpaid indebtedness, secured by a chattel mortgage on 1,180 cattle, given by us to Strahorn-Hutton-Evans Commission Company, dated September 21, 1901, filed for record at Ardmore, I. Ty., on the 27 day of Sep., 1901.

"Kate Huntley,

"W. M. Huntley,

"No. 13217.        By W. M. Huntley, Agt.

"Postoffice: Rush Springs, I. Ty."

While dated at Kansas City, Kansas, the note was executed in the Indian Territory.

The Mr. Seymore who represented the bank in the purchase of the paper, has since died, and it is suggested in defendant's brief that his death is the reason Todd, acting on behalf of the company, could not or did not testify.

At a certain time in October, 1903, rumor reached the bank that the company was in distress. Thereupon its president interviewed Hutton. Afterwards other representatives of the bank interviewed him. At the first interview nothing of material importance occurred. At the second time on inquiry as to the condition of the Huntley mortgage he, Hutton, stated in effect that the mortgage security was questionable on account of the freezing of cattle. Stress is laid on this admission. Counsel seek to give to it the significance that Hutton knew that fact in May, 1903, when the note was negotiated. At about the time of these interviews the creditors of the company had a meeting and by consent of them all, except one not disclosed, the affairs of the company were left in its charge, or really Hutton's, to wind up. Plaintiff participated in this meeting and acquiesced in that course. There is undisputed evidence, as said, that Mr. Hutton then believed that, with careful management, all the obligations of the company would be met. Under this belief there was then placed on the back of the Huntley note a guarantee of the company that the note would

be paid. This guarantee was not met. While the affairs of the company were in process of liquidation, Hutton, in the fall of 1903, on payment being made on the Peery mortgage of date of December, 1902, released that mortgage. Peery sold part of the cattle to one Harness and one White and on payment Hutton in the fall of 1903 released or partially released their mortgages. Representatives of the bank went to the Indian Territory and found no cattle subject to the mortgage.

On the foregoing record, we observe:

(a) The charge in the petition that the company on May 26, 1903, was in a failing condition and that such fact "was well known to said T. S. Hutton" is not sustained by the evidence. *Contra,* the evidence shows it was solvent and believed to be solvent, and its indorsements on discounted paper effective. Conditions leading up to its undoing developed in the cattle market in the summer of that year.

(b) The charge in the petition to the effect that on April 29, 1903, the defendant, well knowing that the security of the chattel mortgage was no longer available but had been exhausted by sale, death, theft or by straying of cattle, did procure the Huntleys to execute their note of that date with intent to cheat and defraud, is not in anywise sustained by the proof.

The facts in this regard on this record are that the Huntley cattle were in a distant country; that in 1902 range fences were partly cut or thrown down where these cattle used; that they were herded in part by "riding the line;" that drouth prevailed; that the range was adjacent to great strips of open timber and unsettled country, some of which was inhabited by Indians and in proximity to the Fort Sill reservation; that the surrender of the cattle to Peery occurred in 1902 under Simpson, the predecessor of Hutton, and that Hutton had no personal knowledge of those facts at that time nor did he know in May, 1903, when the

note was transferred that all the discoverable cattle had been surrendered.

It must be constantly borne in mind that plaintiff is not seeking to hold Simpson, Peery, Todd or the company itself for fraud. Therefore, we are not concerned with a cause of action in that behalf which may or may not exist as to the company, Todd, Peery or Simpson. Plaintiff is seeking to hold Hutton and may not transfer liability from each or any of the foregoing parties to him on that allegation without proof of his knowledge of or participation in what was done before he left Texas and became the ranking executive officer in Kansas City. The fact that Mr. Hutton in October, 1903, released mortgages given by Peery, White and Harness on cattle once covered by the Huntley mortgage does not tend to show his knowledge in December, 1902, or in May, 1903, of the Huntley and Peery transaction in the Indian Territory. It merely shows that at a certain time in the routine of business he made mortgage releases on payment. Nor, taking plaintiff's evidence as true that Hutton admitted after the company became insolvent that many of the cattle under the Huntley mortgage had frozen, does such admission tend to show that either in December, 1902, or in May, 1903, he had such knowledge. It was natural that when the company got into distress and its assets and liabilities were under scrutiny he would inform himself on each item of liability or asset. So, the record wholly fails to show that Hutton had part or parcel personally in renewing the Huntley mortgage on the 29th day of April, 1903. His participation or knowledge in that behalf cannot be based on the bare fact that he was ranking executive officer in Kansas City. The details of the business of a great concern in charge of a manager like Todd and divided into departments, with its ramifications over a great territory as large as France, possibly, cannot be assumed as in the keeping

of the highest officer directing the *general* course of the large affairs of its business and frequently absent from headquarters.

(c) The case then narrows itself to this: If Hutton is liable it is on the wording of his letter of May 26, 1903, as vice-president, and not because of any other specification of fraud in the petition.

(1) There is a promise in that letter to the effect that all the paper inclosed for discount would be met promptly at maturity. Something is made of that phrase by respondent's counsel. It is suggested as an element in the fraud, or, if not an element, at least a bit of color painting the fraud a darker hue. But we know of no principle of law making a promise to pay a debt when due or an assertion that a debt will be paid promptly when due, an actionable element in fraud. Frauds, either in civil or criminal law, are not based on prognostications. Who may know what a day will bring forth? No man stands condemned in the law because hope springs in his breast or because out of the fullness of his heart his mouth speaketh in that regard. Therefore, the law does not interdict prophesying, the expression of sanguine business hopes and beliefs in events to come. The suggestion in hand comes with ill grace from the plaintiff. It jauntily took gainful chances, resting *in futuro,* somewhat on the very edge of conservative banking; for it not only dealt in cattle paper but in a sense it dealt in *paper cattle*— "sight unseen"—cattle roaming in unknown far-away pastures, purporting to be owned by men unknown to the bank. Preliminary to investing, it clapped an eye on no hoof of cattle, but its course of dealing with the company must be held to have rested largely on the relation of indorser and indorsee. It took paper expecting the indorser would protect it in the first instance at least. Theretofore such paper had always been promptly taken up by the indorser and there is no testimony tending to show that defendant or

the bank did not believe the Huntley note would be promptly taken up by the company when due.

(2) Finally, we come to this proposition: Is defendant personally liable because of the statement in the letter that: "You will note that all these are renewals except one note, for which ample provision is made in our form of mortgage." Counsel argue that taking that statement in the letter, in connection with the narration in the Huntley note inclosed, a case is made.

We do not think so. This because:

(a) The petition counts on fraud and deceit. In that form of action the *scienter* is an indispensable element. The petition therefore alleges guilty knowledge in Hutton—knowledge that the narrations in the Huntley note were false and an averment is made that his letter of May 26, 1903, was intended to make and did make those false narrations effective. As we have seen there was an utter failure of proof on the *scienter* strictly speaking.

(b) But counsel say (and this proposition may be conceded to them) that there may be such recklessness in stating facts as takes the place of actual guilty knowledge, stands as and for a technical *scienter,* and amounts to fraud and deceit. In this behalf they argue that the narrations in the Huntley note, coupled with the statement in the letter, amount to an assertion that the inclosed note was actually secured by 1180 cattle at the very time and that, conceding Hutton was ignorant of the facts, yet his statement of fact, as a fact, being itself false, amounts to proof of the allegation that he "falsely and fraudulently represented the said note was secured on 1180 head of cattle" and "falsely and fraudulently pretended that said cattle were then at or near Rush Springs, Indian Territory, and subject to said mortgage."

Attending to this view of the case, what does the

224 Sup—5

letter itself say? The alleged poisonous words are: "You will note that all these are *renewals*, except one note, *for which ample provision is made in our form of mortgage.*" As a preliminary remark, it is proper to say that we should solve all doubts in favor of good faith and not wring a fraudulent meaning from the words by enlarging the meaning by an interpretation either too loose or too close. Now, the notes inclosed in the letter, save one, were "renewals." Hence, there was neither false suggestion or *suppressio veri* in using that term. The words "for which" refer back to the word "renewals." Hence, those words may, without alteration in sense, be amplified into "for which renewals." What kind of provision was made? The answer is: "Ample provision." Where was ample provision made? The answer is: "In our form of mortgage." What does "provision" mean except a clause contractual in character or dealing with the subject-matter (i. e., renewals)? In the connection it is used, "ample" means full, complete, sufficient. So that, on just analysis, the language of the letter must be held to mean: "All these notes (save one) are renewal notes, for which renewals there is a full mortgage clause or provision inserted in the form of chattel mortgages used by this company." Which is no more and no less than to say that the company's form of mortgage is so written as to contemplate and provide for renewal notes. The sum of it all being as said, we find the record discloses that the mortgage had such provision. Therefore, taken by or large, the language complained of in the letter was literally true. As we have seen, then, the words of the letter do not import that the very note inclosed was, at the very time the note was sent to the bank, secured on 1180 head of cattle at or near Rush Springs, I. T., and subject to the mortgage, as alleged in the petition and as argued here.

But learned counsel for respondent argue, as said, that the narrations of the letter must be read in connection with the narrations of the inclosed Huntley note, and that, read together, they assert that the Huntley renewal note was secured by that number of cattle then at the above point in the Indian Territory and subject to the mortgage. The first question to settle, in this view of the case, is whether the representation made by the Huntleys in their note is a representation by Hutton. Is it the law that when the president of a bank signs a letter prepared, say, by the cashier, and incloses in the letter a bundle of instruments or documents furnished by the cashier to be sent as an inclosure with the letter, that the president makes all the recitations in these documents and instruments his own by merely inclosing them with his letter? And this, too, to fasten actual fraud upon him? If we take that view of it, an agent of a corporation assumes a liability and responsibility hitherto unhinted at and undreamed of in the philosophy of the law. We deem the proposition unsound on its face; for the law must comport with reason. To know the law one must know the reason of the law; and what says our Lord COKE?—"He who knoweth the law and knoweth not the reason thereof, soon forgetteth his superfluous learning."

But admitting, for the purposes of the argument only, that the words complained of in both the letter and the note should be construed together, yet, in that view of it, it is pressing the matter too hard and too far to say that the note and letter (read as one) assert that the very note inclosed was at the very time of writing the letter secured by any particular number of cattle then at any particular place in the Indian Territory. The language of the note is: "This note is given in renewal of unpaid indebtedness, secured by a chattel mortgage on 1180 head of cattle, given by us to Strahorn-Hutton-Evans Commission Company,

dated September 21, 1901, filed for record at Ardmore, I. T. on the 27th day of September, 1901.'' Confessedly the note was given in renewal of unpaid indebtedness. So much is certain. The chattel mortgage referred to bore the date stated in the note. So much more is certain. It was filed for record at the place and time designated. So much also is certain. Following the signatures of the Huntleys to the note is an ear-marking memorandum reading: ''Post-office, Rush Springs, I. T.'' That means that the postoffice address of the *Huntleys*, not of the *cattle*, was at Rush Springs, I. T. Nor does it mean that the cattle were at or near Rush Springs as alleged in the petition and contended by respondent. That recitation in the note identified the original chattel mortgage by giving the number of cattle in it, the date of it and where and when filed for record. It also gave notice to all concerned that the indebtedness was ''unpaid indebtedness.'' That language fairly suggests original indebtedness secured by the mortgage and in part paid. The note referring to the chattel mortgage, if we go to that mortgage we find the record shows it secured an indebtedness of $20,000 on 1180 head of cattle, and that the mortgage was so written as to cover accretions to the breeding herd. The mortgage was dated a year and eight months before the renewal note and we construe the language to mean that the unpaid indebtedness, *viz.*, $6,048.01, is secured, not by a new or other mortgage, but by the old mortgage securing the old indebtedness of $20,000 on a specified number of cattle, *to-wit*, 1180, in September, 1901. It does not mean that the remainder of the debt evidenced by the renewal note, dated in 1903, was necessarily secured by the same number of cattle. Why should it mean that as between the parties to this suit? In construing this verbiage it will not do to read out of it the illuminating fact that all the parties knew it was a cattle transaction begun long before the date of the renewal note, knew

the herd was a breeding herd, knew that the number of cattle in the old mortgage in the ordinary run of things was bound to wax by the accretions of calves born and bound to wane by a percentage of usual loss by cattle dying, or straying, or loss from shipping at the proper time that part of the herd fit for market—thereby shaving down the original indebtedness and leaving any unpaid indebtedness secured by remaining cattle. The renewal note taken with the contents of the mortgage, shows that the original indebtedness of $20,000 was reduced to $6,048.01. It might be said that plaintiff did not know the disclosures of the original mortgage in this behalf. But an answer to that is that while plaintiff did not see the mortgage itself, yet to look was to see. The call in the note pointed to the mortgage, and, if plaintiff shut its eyes to the contents of the mortgage, it ought not to bottom any claim on such voluntary blindness. The bank would have us believe it construed the language of the note to mean that the unpaid indebtedness was secured by 1180 cattle at the time the note bore date. But it is unreasonable to assert it understood the language in that way. It had notice that more than two-thirds of the original indebtedness had been paid and it ought not to be allowed to say, in the light of the usual course in a cattle transaction, that the cattle remained precisely as enumerated a year and eight months before. Fluctuation in debt and cattle seems to be a usual incident in the history of a cattle deal running for the length of time of this one, where the mortgaged herd is shown to be a breeding one, plus marketable stuff; and this to-be-expected fluctuation happened in this case.

Observe, we are dealing with the naked language of the note and letter. We do not care to go outside that naked language. This, for the reason that plaintiff bank did not go outside—it asked no explanation of the meaning of the letter or note. Being charged

with notice that the number of cattle must fluctuate in a herd intended for breeding as well as marketing, it made no inquiry as to the number of cattle on hand, at that very time securing the renewal note.

If we were to hold (which we shall not, in this form of action counting on actual fraud) that Hutton was charged with notice of what the books showed had become of the whole 1180 cattle, yet that does not fasten such recklessness upon him as would amount to proof of the *scienter* and therefore of fraud; for there is no pretence any of the company's books showed that the whole herd had been turned over by prior shipments and by the Huntley and Peery transactions in December, 1902. It would be a novel proposition in ethics and a most anxious and vexing precedent in commercial law to hold that Hutton, ignorant of the facts and innocent of wrongful intention, could be held so reckless as to be guilty of fraud in stating what he personally did not know to be true, when, in the usual course of the company's business, a trusted employee (presumably familiar with all the facts) prepared a statement for him to sign and which he did sign in good faith relying on such employee.

We shall not swell this opinion by extended excerpts from decided cases, but content ourselves with quoting from the syllabus of a leading case decided in the House of Lords, and which, as pointed by learned counsel, met the approval of this court in Bank v. Byers, 139 Mo. l. c. 653. The case referred to is Derry v. Peek, 14 App. Cas. (L. Rep.) 337. The syllabi correctly formulate the propositions ruled and are apposite and lucid statements of acceptable law—in part reading as follows: "In an action of deceit, the plaintiff must prove actual fraud. Fraud is proved when it is shewn that a false representation has been made knowingly, or without belief in its truth, or recklessly, without caring whether it be true or false. A false statement, made through carelessness and without

reasonable ground for believing it to be true, may be
evidence of fraud, but it does not necessarily amount
to fraud. Such a statement, if made in the honest be-
lief that it is true, is not fraudulent, and does not
render the person making it liable to an action of de-
ceit.''

The doctrine of the Derry case accords with the
doctrines of this court. [Fusz v. Spaunhorst, 67 Mo.
256; Bank v. Trust Co., 179 Mo. 648; Bank v. Hill,
148 Mo. 380; Utley v. Hill, 155 Mo. 1. c. 251 *et seq.;*
Bank v. Byers, *supra.*] And, applying that doctrine
to the facts here, we must acquit defendant of actual
fraud or of such recklessness in statement as supplies
proof of the *scienter* and amounts to such fraud.

Says BLECKLEY, C. J., in Hull v. Myers, 90 Ga. 1. c.
677: ''Good sense, good morality and good law are
one and the same so long as they are not sundered
violently by legislation or ignorantly by judicial er-
ror.'' And, in our opinion, it is good sense, good
morality and good law to rule as announced.

It is settled law that an agent, such as Hutton
was, is not liable to third persons for mere negligence
in non-feasance. In such cases the rule is: Let the
master answer (*respondeat superior*). But no agent
masquerading under the cloak of a corporate name may
escape liability for an actual fraud working an injury
to a third person. The general rule is that in matters
*ex contractu* a third person dealing with the known
agent of another, whether that other be a person or a
corporation, is deemed to deal (not on the credit of
the agent, but) on that of the principal. If that rule
does not obtain in a given case it is because fraud
avoids the rule and thereby the door to liability swings
wide open to an action *ex delicto.*

Now, fraud is commonly deeply hid away. Often
it can only be got at by inference. It is scarcely ever
proved by admissions; for it blows no trumpet. One
cannot put his finger on it and say: Lo, here it is!

or there it is!—palpable to the touch. But it is got at by following its tracks from results back to the inception of the affair or from the inception of the affair forward to results. To that end courts are full of solicitude and look well with a jealous and anxious eye. Therefore they permit a minute search and a wide one in pursuit of fraud; for it may now and then be seen through a small crevice, and seemingly indifferent things, without sinister significance when taken separately, may, when properly dovetailed together, establish fraud. Courts are fond of saying so much as that. [Black v. Epstein, 221 Mo. 286; State ex inf. v. Standard Oil Co., 194 Mo. 1. c. 154 *et seq.;* St. Francis Mill Co. v. Sugg, 206 Mo. 1. c. 155.] Neverthless, actual fraud is a malevolent and willful act. The *difficulty* of proving it, does not dispense with the *necessity* of the proof. It must not be deduced from mere suspicion. It is not proved by insinuation and innuendo. It is never given body and form by mere presumptions. So that where two views are open, as in the case at bar, the one noble and the other ignoble, courts of justice out of tenderness to humanity will not belittle mankind by taking the ignoble rather than the noble view. Applying that doctrine to this case it is clear the judgment against the defendant is wrong.

In this connection it is argued that we are bound by the findings of fact made by the trial court in a law case. That is sound doctrine, when applied to a proper case. But in the case at bar fraud is predicated of the written narrations in the note and letter. Conceding that the trial court had the right to interpret the note and letter, yet (whatever the rule in weighing oral testimony) he occupies no position superior to the appellate court in interpreting writings.

Learned counsel for defendant argue at length on the Statute of Frauds. [R. S. 1899, sec. 3422.] They say that a proper construction of that statute on techni-

cal grounds relieves defendant from liability. But, as the case is disposed of before that statute is reached, it is not worth while to pass on the point. Accordingly, the question is reserved.

.This case was submitted in Division and came into Banc on dissent. On re-argument in Banc the foregoing divisional opinion by *Lamm, J.*, is adopted by a majority of the brethren. *Burgess, J.*, not sitting; *Woodson, J.*, dissenting. The premises considered, the judgment is reversed. It is so ordered. *Valliant, C.J., Gantt, Fox* and *Graves, JJ.*, concur.