LYNCH et al., Respondents, v. SOUTHERN MINING LAND & LUMBER COMPANY et al., Defendants; WURDEMAN and BRANDT, Appellants.

St. Louis Court of Appeals, February 23, 1909.

FRAUD: Officers of Corporation: Prima-Facie Case. In an action against a corporation and its officers to rescind a contract of purchase, whereby the plaintiff had acquired certain corporation bonds, on the ground of fraud, where it was proven that the plaintiff was induced to purchase the bonds by gross misrepresentations as to the property and resources of the corporation and that the mortgage securing the bonds conveyed land to which the company had no title, the president of the company who was made a defendant could not defeat the action, as against himself, on the ground that he knew nothing of the false representations or anything about the company's property, where it was shown that he executed the mortgage securing the bonds.

Appeal from St. Louis City Circuit Court.—*Hon. O'Neill Ryan*, Judge.

AFFIRMED.

*Joseph S. Laurie* and *Arthur Digby* for appellants.

In order to recover against either of said defendants, the evidence must show not simply the neglect of official duty by the defendant directors, whereby the plaintiffs herein suffered loss, but actual fraud upon the part of said directors in the transaction complained of. Fusz v. Spaunhorst, 67 Mo. 256; Bank v. Hill, 148 Mo. 380; Utely v. Hill, 155 Mo. 232; Stone v. Rottmann, 183 Mo. 552; Webb v. Rockefeller, 195 Mo. 74; Clark v. Edgar, 84 Mo. 106; Priest v. White, 89 Mo. 609; Bank v. Byers, 139 Mo. 627.

*John M. Dickson* and *A. J. Haverstick* for respondent.

(1) Directors of a corporation who put on the market false securities in the name of the corporation are individually liable in an action of fraud and deceit to purchasers of such securities who are thereby injured. Clark v. Edgar, 12 Mo. App. 345; Clark v. Edgar, 84 Mo. 106; Steam Stone Cutter Co. v. Scott, 157 Mo. 520. (2) Wurdeman and Brandt were immediately connected with and responsible for the bond issue, Wurdeman executing in the company's behalf as president all papers and contracts connected therewith, and Brandt as director and stockholder, authorizing the issue; and both come within the rule that, "Every man must be responsible for the consequences of a false representation made by him to another, upon which a third person acts, and so acting is injured and damnified; provided it appears that such false representation was made with the intent that it should be acted upon by third persons in the manner that occasions the loss. Peck v. Gurney, L. R. 6, H. L. App. 377, approved in Watson v. Crandall, 7 Mo. App. 233.

BLAND, P. J.—The defendant corporation was organized on December 19, 1902, with a capital stock of $500,000, of which $150,000 was preferred stock entitled to a perpetual dividend of six per cent per annum. The par value of the shares of stock was one dollar and was subscribed for as follows:

"COMMON STOCK.

| Names and Residence. | No. of Shares. |
| --- | --- |
| Herman D. Brandt, St. Louis, Mo. | 150,000 |
| William C. Young, St. Louis, Mo. | 100,000 |
| Henry W. Femmer, St. Louis, Mo. | 100,000 |

PREFERRED STOCK.

| Names and Residence. | No. of Shares. |
| --- | --- |
| Herman D. Brandt, St. Louis, Mo. | 50,000 |
| William C. Young, St. Louis, Mo. | 50,000 |
| Henry W. Femmer, St. Louis, Mo. | 50,000 |

The first board of directors consisted of the three incorporators. Young and Femmer surrendered their stock to the corporation and resigned as directors in 1903. Defendant Wurdeman and L. T. Sneed were elected to take their places, and Wurdeman was elected president of the company. The articles of incorporation stated that the capital stock had been "actually paid up in lawful money of the United States and is in the custody of the persons hereinafter named as the first board of directors." The truth is, not a dollar in money was actually paid. The company was organized for the purpose of exploiting some mining properties in Jefferson county, Missouri, upon which Thomas F. Sneed had mining leases, all of which, and some others acquired thereafter, were for the term of ten years, and conveyed only the right to dig and search for minerals thereon, and were to become void unless an amount of money, ranging from three hundred to six hundred dollars per annum, was expended by the lessees in searching for minerals. The rents to be paid were stipulated royalties on the minerals actually mined from the property. To each of these leases was superadded an option to purchase the land itself at a stipulated price, at any time during the life of the lease. These leases covered between four and five hundred acres of land and were assigned to the corporation by T. F. Sneed, in December, 1903. The corporation, through Sneed, expended some money in prospecting for minerals on some of the properties but never took out any mineral. The properties were finally abandoned and the corporation became defunct. After acquiring the leases and after the company was incorporated, Sneed promoted the incorpora-

tion of the St. Louis, Hillsboro & Southern Railroad Company, an electric road to run from Carondelet to Hillsboro, in Jefferson county. This line of road, as projected, was to run through some of the leased land and near the remainder. Defendant Wurdeman was Sneed's attorney in procuring the incorporation of the railroad company and loaned him fifty dollars toward paying the incorporation tax, and also brought several condemnation suits at his request, to acquire right of way of the road. Wurdeman testified his services rendered Sneed in behalf of the railroad company were worth one thousand dollars but he had never been paid. The railroad was never built. In the spring of 1903, Sneed and defendant Brandt went to New York City for the purpose of raising money on the stocks or bonds of the mining company but failed in their endeavor. While in New York Sneed wrote Wurdeman the following letter:

"St. Louis, Mo., Jan. 9, 1903.
"Mr. G. A. Wurdeman,
            Webster Groves, Mo.:
    "Dear Sir: I herewith enclose you a certificate for $10,000 of the full paid non-assessable stock in the above Mining Company. This is the one I spoke to you about several weeks ago and that I was going to place you in the Board of Directors. I also send you prospectus.

    "I am about to arrange now to have 100,000 of this stock sold in New York. If you should happen to find anybody that wants to invest in some of the preferred stock it would be appreciated, as I want to dispose of $50,000 worth of that here.

    "If Brandt gets back in time we in all probability will call on you some time Sunday afternoon to talk things over; in that case one of us will telephone you in advance.

                            "Yours truly,
                                "T. F. SNEED.

"You need not laugh, this will be worth par before the end of 1904."

The letter and certificate of stock for $10,000 were received by Wurdeman and he kept the stock. On July 17, 1903, Wurdeman, as president of defendant company, and in the name and for the company, signed and, on August twelfth, acknowledged a deed of trust purporting to convey to the Missouri Trust Company of St. Louis, as trustee, four hundred and eighty acres of land in Jefferson county (land upon which Sneed had procured mining leases) to secure the payment of $300,-000 worth of bonds of the Southern Mining Land & Lumber Company, to be executed on the execution and delivery of the mortgage to the Missouri Trust Company. The mortgage purports to be executed in pursuance of a resolution passed by the unanimous vote of the board of directors, which resolution is copied in the mortgage. After the execution of the mortgage, Wurdeman also signed three thousand thirty-year bonds of the denomination of $100 each, secured by the mortgage, which he delivered to Sneed.

On August 5, 1903, the Southern Mining Company and the Missouri Trust Company entered into the following agreement:

"The Southern Mining, Land and Lumber Company, incorporated under the laws of Missouri, and the Missouri Trust Company of St. Louis, agree and covenant to and with each other in the manner following, that is to say:

"Said Southern Mining, Land and Lumber Company is desirous to procure from said trust company the certificates of said trust company, due in thirty years, for the aggregate sum of fifty thousand dollars ($50,000), to be issued in denominations of one hundred dollars each, and agrees to deposit with said trust company, for each certificate, at the time or before the same is issued, the sum of forty-one dollars and twenty cents

($41.20), and to pay said trust company presently for entering into this contract, the sum of two hundred and fifty dollars ($250).

"Said trust company agrees to accept said trust deposits, and to accumulate each of the same in thirty years, from forty-one dollars and twenty cents to the full amount of one hundred dollars. Any accumulation of said sum in excess of one hundred dollars, to be the sole property of said trust company; and in consideration of the premises, said trust company warrants the said sum shall be so accumulated by it as to amount to one hundred dollars in thirty years from the date the deposit is made with it of forty-one dollars and twenty cents, and said trust company is not to charge for its services hereunder any other or extra fee than as aforesaid.

"Said trust company agrees, when and as such deposits are made, to issue its certificate therefor, substantially in the following form."

The bonus of $250 was paid the trust company and a few deposits of $41.20 were made, for which the trust company issued certificates as it had agreed to do.

T. F. Sneed was the manager of the Southern Mining Company, and after the execution of the mortgage and the signing of the bonds issued a prospectus in which the following false statements were made:

### "Lead and Zinc.

"One zinc mine will turn out five tons per day, at a cost of $8 per ton; or $40 per day. This ore will sell for $40 per ton, or $200 per day, leaving a net profit of $160 per day.

"One lead mine will turn out two tons of lead ore per day at a cost of $8 per ton, or $16 per day. This ore will sell for $50 per ton, or $100 per day, leaving a net profit of $84 per day.

"One lead mine will turn out four tons per day at a cost of $8 per ton, or $32 per day. At $50 per ton will leave a net profit of $168 per day.

### "OCHRE AND KAOLIN.

"One ochre bed will turn out sixteen carloads of ochre per day at a cost of $30 per car, or $480 per day. This ochre sells for $60 per car, or $960 per day, which leaves a net profit of $480 per day.

"One Kaolin bed will turn out one hundred and fifty tons per day at a cost of $7 per ton, or $1,050 per day. This Kaolin sells for $10 per ton, or $1,500 per day, leaving a net profit of $450 per day.

### "LEAD AND ZINC MINING.

"The lead and zinc mines can be operated profitably with the present railroad facilities, and much cheaper when the electric railroad is completed.

"The foregoing estimate does not include all the mines owned and controlled by this company.

"The company owns and controls long term leases on over five hundred acres of productive mineral and clay lands in Jefferson county, Missouri, right in the heart of the richest mining district in the world, and has control of several tracts of mineral lands in Washington and Franklin counties. The company proposes to operate these mines on modern methods, guided by men of practical experience, which is the surest guarantee of success in any business.

"The company is now operating one zinc mine that runs sixteen tons of jack to the one hundred tons of rock taken out. This ore-bearing rock is now eight feet in thickness, and is still increasing in depth. Several shafts have been sunk on these tracts of land from ten to ninety feet in depth, and the very best grade of zinc has been found in every shaft, and developing has been done by individuals. No attempt has been made to sell

bonds until the properties have been thoroughly developed, and the company does not hesitate now in placing the bonds on the market, fully realizing the value of these mines.

## "ORE IN SIGHT.

"The Southern Mining, Land and Lumber Company is now operating other zinc mines, and has removed tons of fine ore and ore-bearing rock out on the banks, and thousands of tons of it is in sight. It is the purpose of this company to operate all of its properties just as soon as proper machinery can be obtained and placed on the grounds, which will materially facilitate mining and handling the large bodies of ore, thereby placing its products at the lowest possible cost in the bins ready for market."

After getting out this prospectus, Sneed employed two soliciting agents and sent them out with it to sell the bonds. By means of the prospectus and by making such verbal representations as Sneed authorized them to make, in respect to the mining property, the solicitors succeeded in selling bonds to plaintiffs. Sneed deposited funds with the trust company to pay the first interest coupons to fall due on the bonds sold to plaintiffs and they were paid. When the second coupons became due, plaintiffs presented them to the Missouri Trust Company for payment, and on learning that no funds had been deposited for the purpose, that Sneed had gone to California, that the Mining Company had become defunct, leaving no assets, and that the mortgage covered lands never owned by the company, joined as plaintiffs in this suit, which is in equity to recover of defendants what they paid for their bonds.

The petition charged, in substance, that plaintiffs were induced to purchase the bonds by the false and fraudulent representations and statements of the defendants, which representations and statements they

believed to be true, and relying on them as true purchased the bonds. The specific acts of fraud alleged in the petition are, in substance, first, that the representation in the article of incorporation, that the capital stock of the company was fully paid up, was false and untrue; second, that the representation made in the mortgage, that the mining company owned the four hundred and eighty acres of land therein described, was false and untrue, that, in truth and in fact, the company owned no land whatsoever in Jefferson county; and third, that the representations and statements contained in the prospectus above set out were false and untrue.

The answer of the mining company was a general denial; that of defendants Wurdeman, Brandt and Young was also a general denial, and the following:

"And for further answer defendants say that at the time the several plaintiffs herein acquired the said bonds, to-wit, the ........ day of ........, 1903, they became stockholders in the defendant company, and as such had access to the books of the said company and were thereby charged with notice of its affairs. Notwithstanding this knowledge they have unnecessarily delayed the bringing of this action to the prejudice of these defendants.

"Wherefore defendants pray to be dismissed with their costs."

The other defendants were not served with process and did not appear to the action. The issues were found against plaintiffs and in favor of defendant Young and for the plaintiffs against the mining company, Wurdeman and Brandt. Only Wurdeman and Brandt appealed.

No complaint is made by appellants that the judgment is excessive, or that each plaintiff is not entitled to recover what was awarded to him by the judgment, if plaintiffs are entitled to recover at all, under the pleadings and the evidence. The evidence shows the

mining company at no time owned any of the land described in the mortgage. Brandt was a director of the company from its organization, and he and T. F. Sneed were the most active members of the board of directors. Brandt and Wurdeman both denied they had anything to do with getting out the prospectus, or knew it had been gotten out until after this suit was begun, and did not know Sneed was selling any of the bonds until after they were sold. Wurdeman testified he never attended a meeting of the board of directors of the mining company; that all he knew about the property of the company was that Sneed, at some time, had shown him some leases which he glanced at; that he had never examined the stock book or the minute book and did not know whether or not the board of directors passed a resolution to execute the mortgage and issue the $300,000 in bonds; that he did not read the mortgage when he signed it, only "glanced at it," nor did he read it when he acknowledged it; that T. F. Sneed brought it to him to sign and he "glanced at it," and signed it at Sneed's request, and then signed the three thousand bonds and delivered them to Sneed; that it was contemplated the bonds should not be sold until the St. Louis, Hillsboro & Southern Railroad Company was completed. Witness also testified he did not know whether the $300,000 of capital stock was paid up or not and had never inquired; that he believed what Sneed told him. On this character of evidence, it is claimed by Wurdeman's counsel, that he was guilty of nothing more than mere negligence and plaintiffs cannot recover against him on account of such negligence, for the reason the petition counts of actual and active fraud. The evidence shows Wurdeman had no hand in getting out the prospectus; that he knew nothing of its existence until the mischief complained of was done. There is nothing in the record to show that he, at any time, entertained a formed purpose to defraud any one by the sale of the bonds, yet as president of the mining company, he executed the mort-

gage purporting to convey lands to which he is chargeable with knowledge the company had no title. This was a false representation, though made unwittingly, and, as the mortgage was recorded, was made to the public at large. Judge Wurdemaan cannot be exonerated from liability on the ground that he merely "glanced" at the instrument and did not read it. By relying implicitly on the statement of Sneed and failing to read the mortgage and failing to ascertain whether or not the company owned the lands therein described, Wurdeman, as president of the company, was guilty of a legal, though unintentional, wrong. As president of the company, he made a solemn representation and statement, that the company owned lands to which it had no title, and this representation, according to the evidence, was one of the inducements which influenced plaintiffs to purchase the bonds; and I think upon clear principles of equity and justice, Wurdeman should be held responsible to plaintiffs for the loss which his act in part contributed to bring about. Defendant Brandt, as the evidence shows, was present and voted for the resolution of the board of directors, authorizing the execution of the mortgage and the bonds, and like Wurdeman is responsible for bringing about a condition of affairs by which plaintiffs were defrauded.

The judgment is affirmed. All concur.

PER CURIAM.—The foregoing opinion prepared by the former presiding judge of this court, was concurred in by the other judges and filed as the judgment of the Court. A rehearing was granted, the appeal again heard and we have perused the record anew without finding a reason to pronounce a different judgment. Incidents and circumstances are in evidence, but not related in the opinion, which tend to show appellants are liable on the grounds charged in the petition and support the finding below, which cannot be reversed or an

affirmance put in a manner that would be more lenient to appellants. We adopt the result of the opinion. The judgment is affirmed. All concur.