LOUIS F. PETERS, appellant, v. L. C. LOHMAN, G. E. GEISSINGER and CHARLES SCHIFFERDECKER, respondents.

Springfield Court of Appeals, May 16, 1913.

1. **FRAUD AND DECEIT: Questions of Fact: Finding of Jury: Binding on Appellate Court.** Where there is evidence sufficient to take to the jury the question as to whether or not certain statements made in a prospectus are untrue, the finding of the jury on that question is binding on the appellate court, providing the instructions submitting the same are proper.

2. ———: **Misrepresentations: Liability of Maker.** Where representations are made, professedly not of personal knowledge, but from information obtained from others on which the utterer relied, the utterer may be held liable for misrepresentations where he does not correctly set forth the information he has obtained or where he knows, or has reason to know, that such information is not correct.

3. ———: **False Representations: Innocently Made: Action at Law.** Representations, though false, if innocent and made without any intention to defraud and under the belief that they were true, furnish no support to the allegation of fraud and deceit, in an action at law.

4. **CONTRACTS: Fraudulent Representations: Suits at Law: In Equity.** There is a distinction between suits at law for damages and suits in equity for the rescission of the contract. The measures of damage are different and the method of trial and the relief granted differ.

5. **FRAUD: False Representations: "Scienter."** "*Scienter*," which is a guilty knowledge or a guilty lack of knowledge, is discussed in its relations to actions at law and in equity for false representations, fraud and deceit.

6. ———: **Misrepresentations: Essential Elements.** To support a personal action for fraudulent representations, it is not sufficient to show that a party made statements which he did not know to be true and which were in fact false. There must be fraud as distinguished from mistake.

7. ———: **Misrepresentations Innocently Made: Not Actionable.** One who has carefully endeavored to learn the truth from appropriate sources and believes that he has learned it, is not liable in an action at law for fraud and deceit.

8. ———: **Corporations: False Prospectus: Liability of Directors.** When directors of a corporation consent to the issuance of a prospectus, stating as facts certain representations therein as to its property, which accord with the facts obtained from trustworthy sources on proper investigation and inquiry and which they honestly believe to be true, they are not liable in an action at law for fraud and deceit, although the representations in fact are false, as guilty knowledge or lack of knowledge cannot be imputed to them.

9. ———: **Actionable Misrepresentations: Evidence Reviewed.** In an action at law against the directors of a corporation for fraud and deceit in the issuance of its prospectus, the evidence is examined and reviewed and *held* not sufficient to establish plaintiff's contention.

10. ———: **Corporations: Prospectus: Meaning of "Stock Fully Paid and Nonassessable."** A representation in a prospectus that the "stock is fully paid and nonassessable" does not mean that any stock holder has paid full par value for same, but refers to the character of the stock and the liability of the stock holders to the corporation.

Appeal from Jasper County Circuit Court.—*Hon. Carr McNatt*, Judge.

AFFIRMED.

*C. H. Montgomery, Hugh Dabbs* and *R. M. Sheppard* for appellants.

(1) The defendants in their printed prospectus in the most positive manner, made many false and fraudulent representations, about the corporation and its capital stock. They made them without knowing whether they were true or false and recklessly indifferent as to the injury they might cause. Plaintiff relying on them purchased $5000 worth of the preferred stock at par; it was worthless when purchased and he lost his money. (2) A party making material statements without knowing whether they were true or false cannot urge as a defense what efforts he made to ascertain the facts and that he acted in good faith. Hamilin v. Abel, 120 Mo. 188. (3) An instruc-

tion for plaintiff that defendant is liable for representations made without knowledge whether true or false is in hopeless conflict with an instruction for defendant that he is not liable unless he knew the representations to be false. Brokerage Co. v. Gates, 190 Mo. 395, and cases cited; Serrano v. Commission Co., 117 Mo. App. 185. That there was no intention to deceive is not a defense. Leach v. Bond, 129 Mo. App. 320. (4) The rule is very strict against the directors and officers of a corporation for making statements without knowledge of their truth, and particularly in a prospectus. Purdy's Beach on Private Corp., sec. 263, note I, 264, 265, 266, 266a, Thompson Liability of Directors of Corp., pp. 401-3. (5) The president of a corporation cannot leave its affairs to others and after signing a mortgage containing false representations claim that he only glanced at it and did not know it was false. Lynch v. Land & Lumber Co., 135 Mo. App, 679. (6) Parties interested in a corporation cannot leave its management in the hands of others and then when someone is injured plead their ignorance as a defense. Hornblower v. Crandall, 7 Mo. App. 220, [which case went to the Supreme Court and the opinion of the Court of Appeals adopted in 78 Mo. 582.] (7) Instructions must be based on the evidence and it is error to give an instruction not based on the evidence. Crow v. Railroad, 212 Mo. 611; Paddock v. Somes, 102 Mo. 226. (8) If a defendant has no basis for believing a representation to be true the court ought not to submit that issue to the jury. Serrano v. Commission Co., 117 Mo. App. 202, 203.' (9) In a case based upon statements without knowledge of their truth, evidence that they acted in good faith is not admissable. Dulaney v. Rogers, 64 Mo. 202; Hamlin v. Abell, 120 Mo. 203. (10) Parties acting in a common enterprise the statements of each are admissible against the others, and their agents against

all. Judd v. Walker, 215 Mo. 333-335; Hornblower v. Crandall, 7 Mo. App. 231, affirmed in 78 Mo. 581. Lynch v. Land & Lumber Co., 135 Mo. App. 660; Hellman v. Somerville, 212 Mo. 432; State v. Roberts, 201 Mo. 702. (11) To represent that the stock of a corporation is fully paid when it is not a material misrepresentation. Stone Cutters Co. v. Scott, 157 Mo. 520; Webb v. Rockefeller, 195 Mo. 71. (12) In actions of fraud the courts have always allowed the broadest latitude in the evidence. Mosby v. Com, Co., 91 Mo. App. 500; Sawyn v. Walker, 204 Mo. 160.

*Spencer, Grayston & Spencer* and *Thomas & Hackney* for respondents.

(1) The evidence wholly failed to prove any allegation of the petition as to any false statement or representation in the prospectus as the number of acres of land owned by the cement company and as to the number of acres on the plateau. And the evidence wholly failed to prove any falsity in the statement in the prospectus as to the leases on gas and coal lands. (2) There was no evidence of any false statement as to the stock of the company being fully paid and nonassessable stock. The plaintiff recognized this failure of proof on the trial and asked no instruction submitting to the jury the question of fully paid, nonassessable stock as one of the representations relied on. This amounted to an abandonment of that feature of the petition. (3) The only remaining statement in the prospectus of which complaint is made in the petition is this: "That you have an abundance of natural gas, which is the cheapest fuel as yet used in the manufacture of Portland cement, and effects a large saving over the use of coal." The evidence showed that this statement in the prospectus appears only in the signed report of B. B. Lathbury, addressed to the

Guthrie Mountain Portland Cement Company. Lathbury's opinion thus printed, was given only for what it was worth. Lovelace v. Suter, 93 Mo. App, 438; Brown v. South Joplin Z, & L. Co., 194 Mo. 681. (4) The defendants believed that Lathbury's judgment was good, and invested their own money in the venture on their faith in the correctness of his opinion. Hence, the defendants, having acted in good faith, could not be held responsible in this action for any supposed error of judgment on the part of Lathbury. Lovelace v. Suter, 93 Mo. App, 429; Bank v. Hutton, 224 Mo. 42; Adams v. Barber, 157 Mo. App, 370; Snyder v. Stemmons, 151 Mo. App. 156; Woods v. Letton, 111 Mo. App. 51; Dunn v. White, 63 Mo. 181; Dulaney v. Rogers, 64 Mo. 203; Bank v. Trust Co., 179 Mo. 648; Seranno v. Commission Co., 117 Mo. App. 197; Bank v. Sells, 3 Mo. App. 85; Green v. Worman, 83 Mo. App. 575; Kountze v. Kennedy, 147 N. Y. 124, 29 L. R. A. 360; Hubbell v. Meigs, 50 N. Y. 480; Wakeman v. Dalley, 51 N. Y. 27, 10 Am. Rep, 551; Oberlander v. Spiess, 45 N. Y. 175; Lord v. Goddard, 13 How. (U. S.) 198, 14 L. C. Ed. 111; Life & Trust Co. v. Life Ins. Co., 148 Fed. 674; Gordon v. Butler, 105 U. S. 553. (5) Under the pleadings the plaintiff was not entitled to recover without showing actual bad faith on the part of the defendants. Seranno v. Commission Co., 117 Mo. App. 197; Lovelace v. Suter, 93 Mo. App. 438; Bank v. Hutton, 224 Mo. 70, 71. Dulaney v. Rogers, 64 Mo. 203; Bank v. Trust Co., 179 Mo. 662. (6) "The representations, though false, if innocent and were made without any intention to defraud and in the belief that they are true, furnish no support to the allegation of fraud and deceit." Green v. Worman, 83 Mo. App. 575; Adams v. Barber, 157 Mo. App. 393; Kountze v. Kennedy, 147 N. Y. 124, 29 L. R. A. 363, 49 Am. St. Rep, 651. (7) The gist of the action is fraud in the defendants, and damage to the plaintiff. Fraud

means an intention to deceive. If there was no such intention, if the party honestly stated his own opinion, believing at the time that he stated the truth, he is not liable in this form of action, although the representation turned out to be entirely untrue. Lord v. Goddard, 13 How. (U. S.) 211, 14 L. C. Ed. 116; Young v. Covell, 8 Johns. 23; Bank v. Sells, 3 Mo. App. 85, 89; Life & Trust Co., v. Life Ins. Co., 148 Fed. 674.

STATEMENT.   Plaintiff instituted this suit against the defendants, alleging that the Guthrie Mountain Portland Cement Company, hereinafter called the company, was a West Virginia corporation organized for the purpose of erecting and operating a cement plant and a brick plant of which defendants were directors; that the capital stock was ten thousand shares of preferred and ten thousand shares of common stock, each of a par value of $100 per share; that at the time the corporation was formed only a small part of the capital stock was subscribed and paid for and the defendants as directors were chiefly engaged in the sale of said stock.

The action is one for fraud and deceit in making false representations as to the property owned by the company, whereby plaintiff was induced to purchase fifty shares of the preferred and fifty shares of the common stock in said company, for which he paid $5000. The petition alleges and the evidence shows that soon after plaintiff purchased this stock the company failed, went into bankruptcy and plaintiff's stock proved worthless. Plaintiff sues for $7500, which he says would be the value of his stock provided the representations made to him by the defendants had been true. Defendants are not accused of making false representations in order to sell stock owned by them individually but in order to sell the unissued stock of the corporation of which they were directors. The representations made by defendants, which plaintiff

alleges to be false and on which he went to the jury on his own instructions, were made in part orally and in part by a printed prospectus issued by the company by the procurement and with the assent of the defendants as directors. The false representations contained in the printed prospectus on which plaintiff relies for his cause of action are as follows:

"(a) The Guthrie Mountain Portland Cement Company owns 670 acres of raw material deposits, perfectly adapted to the manufacture of a high grade Portland cement, situate near the town of Mapleton, Bourbon county, Kansas.

"(b) In addition to the raw material deposits owned by this company, it also holds perpetual leases on over 2000 acres of natural gas and coal land, lying immediately adjacent to the raw material property.

"(c) This company has contracted with the Goodspeed Gas & Oil Company, whose holdings amount to over 4000 acres of good gas and oil land with a present production of over 35,000,000 cubic feet per day and capable of further development when needed. This company has agreed to furnish gas for fuel to run our entire plant at a cost of three cents per thousand cubic feet, which will bring the fuel cost of manufacture on an equal basis with the plants already in operation in the southern Kansas district where gas is used for fuel.

"(d) Further, should the company elect at any time in the future to use coal for fuel, it is in a position to do so at a much cheaper cost than other plants in the middle west due to the fact that it controls valuable coal lands whose output will be sufficient to run the plant for years to come.

"(f) There were 580 acres on the plateau covered with an upper strata of limestone which varies from sixteen to twenty-one feet in thickness.

"(g) That you have an abundance of natural gas which is the cheapest fuel as yet used in the manufacture of Portland cement and effects a large saving over the use of coal."

It appears, however, that the plaintiff practically abandoned the allegation that the representation contained in paragraph "c" relating to the contract for a supply of natural gas was in fact false.

The oral representations on which plaintiff relied as being made and being untrue were limited to the defendant Schifferdecker, and are as follows:

"(a) That Schifferdecker and Geissinger has each purchased $40,000 of the preferred stock of said company.

"(b) That said company then held leases on 4000 acres of gas land in the Kansas gas belt near their works near Mapleton, Kansas, and that said company had then developed on said gas leases owned by them, gas wells of a daily capacity of 30,000,000 cubic feet of gas per day.

"(c) That said company had then developed on said land owned by said company at its plant near Mapleton, Kansas, three veins of coal, one of which was cannel coal."

The petition alleges that said statements and representations as made to plaintiff by said directors on behalf of themselves by and through their said prospectus and by certain agents selling stock of the company, "were false and untrue, and that these defendants knew that said statements and representations were false and untrue at the time they were made." Plaintiff further alleged and testified that said stock was of no value at the time he purchased it and that he would not have purchased the same except for the statements and representations so made as aforesaid by and on behalf of said defendants.

The defendants answered separately but each answer is merely a general denial. The trial was had by a jury and resulted in a verdict for the defendants.

The company's property and the proposed brick and cement plants were located in Bourbon county, Kansas. The principal office of the company was at Kansas City. The plaintiff and defendants Schifferdecker and Geissinger all lived at Joplin. The defendant Lohman, who was president of the company during most of the time of this controversy, lived at Jefferson City. None of the defendants were the original organizers or promoters of this company, but each became a stockholder by purchase of stock after its organization. Schifferdecker to the amount of $30,000, Geissinger, $15,000, and Lohman, with some personal friends, $10,000.

The company seems to have been organized with very little, of its stock actually subscribed or paid for. The stock was to be issued as sold. There is no doubt but that for a year or more the directors of this company gave considerable attention to the matter of selling its stock. It was necessary to do this in order to obtain funds with which to build and equip the brick and cement plants and to develop its natural resources. This company seems to have been organized at a time when the cement business was on a boom, resulting in the building of plants throughout the country and much speculation in this line of business. The business of this particular company was one of large possibilities and authorized capital but that was all. The company owned 443 acres of land, which the evidence shows contained large quantities of natural cement and brick material and was located in or near the Kansas natural gas belt. It had a contract with a gas company to supply it with natural gas in large quantities and at a low rate. It appears that the main purpose of the company was to manufacture cement rather than brick and it contemplated building a ce-

ment plant to cost from six to eight hundred thousand dollars, with a daily capacity of two hundred barrels. This plant was never built. The company built and commenced operating its brick plant, connected the same by pipe line with gas wells, built a hotel, a railroad switch and did more or less preliminary work with reference to the cement plant. The evidence shows that the prime factor in the manufacture of cement is an abundance of pure shale and limestone as raw material and a cheap and abundant supply of fuel. The question of water supply, shipping facilities, ability to obtain labor and other matters were of more or less importance. None of the defendants had made more than a cursory examination of the company's property and had no practical or expert knowledge on these questions.

We think the evidence makes it reasonably clear that the company did in fact have an abundance of raw material with which to successfully manufacture cement and brick and; that its chief difficulty was the failure to obtain an abundance of cheap fuel. The defendants' evidence tends to show that this was due to the unexpected and unforeseen failure of the natural gas wells, not an uncommon thing, throughout that district. The defendants' evidence also tends to show that one of the real causes of the financial collapse of the company was due to a sharp decline in the price of manufactured cement, the price going down to about half what it had been in previous years.

The defendants' evidence tends to justify themselves in permitting to be issued the prospectus containing the alleged false representations, and in making any oral representations of like import, on the ground that same were substantially true in fact and that if untrue in any particular such prospectus and oral statements were issued and made in good faith and in accordance with reports and investigations made by reliable experts and other representatives of

the company, and were based on reliable information obtained by defendants as directors, and which the defendants honestly believed to be true.

A· witness, who was the manager of a large and successful cement company, stated that he had examined this company's property with a view of buying it about the time this company failed and that considering the property as a whole, including the location, market, shipping facilities and labor supply, he considered it as good a proposition as he had ever inspected; that limestone and shale were both used in the manufacture of cement and that the extent of the deposit of rock and shale upon the company's land was ample to provide for the operation of the plant for seventy-five to one hundred years, and that same was so located as to afford great natural advantages in working the same. He stated, however, that he did not know as to the fuel supply.

As sustaining their defense, the defendants further showed that the prospectus was not prepared by any of them individually but by another officer of the company on whom they relied as being better acquainted with the facts relating to the company's property and business; and that the prospectus was in part, at least, based on the report and investigation of an expert on natural gas, an expert on raw material for manufacturing cement, and an expert engineer as to the raw material and the way in which it could be handled, manufactured into cement and the product disposed of.· The entire prospectus is not in the record but it is shown that to some extent at least the reports of these experts were contained in and referred to in this prospectus. The report of the expert on raw material contains the statement that "you have an abundance of limestone and an immense body of shale of the right kind to make an excellent quality of Portland cement. The choice of your location for the plant is ideal; for fuel you have natural gas or

coal, which ever you prefer; you have water in abundance; for shipping facilities, your property borders on the railroad. Actual tests made with your material prove that you can manufacture a Portland cement equal to any brand. With all these natural advantages you cannot help but make a success of your undertaking.''

The report of the expert engineer, after explaining in detail the company's property and advantages for manufacturing cement, stated as follows: ''Summing up the advantages possessed by your property, it is well to bring out the following facts: That a Portland cement can be produced by a combination of your limestone and shale under the most favorable conditions; and equal in quality to the highest standard grades of Portland cement; that the extent of the deposits are ample for a plant of a very much larger capacity than you propose erecting; that the physical contours of the property are well fitted for a modern mechanical cement plant with strong features, permitting its economical erection; that you have an abundance of natural gas, which is the cheapest fuel as yet used in the manufacture of Portland cement and effects a large saving over the use of coal; that in case of possible contingency of the decline of natural gas you have local coal with mines not more than one hundred miles away, which insures a bituminous coal at cheaper rates than any of the large mills in the Lehigh regions are paying to day; that you have an abundance of water from the river for all purposes; that the climate conditions are most favorable for operating a plant continuously during the entire year; that the low percentage of rainfall throughout the year will facilitate operation of your quarry and drying of your materials presenting a considerable saving at the end of each year; that the cost of production with a plant of modern equipment, as outlined, should equal per unit

of production to the performance of any plant in this country.''

Defendants' evidence shows that the estimate as to the supply of natural gas was based on tests made by experts in that line of business; that these tests consist chiefly of the pressure shown by the gas wells; that this was the general and, perhaps the only method of making estimates for the future supply of gas.

The plaintiff's evidence tends to show that the company's property was never of any substantial value; that the reports and estimates made by these experts were totally unreliable and untrue and that defendants as reasonably prudent men ought not to have believed the same or issued the prospectus setting forth as facts the conclusions and estimates made by such experts. It is especially claimed by plaintiff that the inadequate supply of fuel rendered the company's property of no real value for manufacturing cement however valuable the natural products may have been; that the estimates as to the supply of natural gas were fundamentally wrong in supposing that the pressure shown by the gas wells would continue for an indefinite time notwithstanding the continued flow of gas from such wells. The most that can be said of these contentions is that they presented questions of fact to be decided by the jury, and left the question of defendants' good faith or intentional fraud to be settled the same way.

As to the number of acres of land owned by the company it will be noted that the prospectus stated that the company owned 670 acres of land, while the company in fact only owned 443 acres. The evidence, however, shows that as soon as the prospectus was issued the defendant Lohman noticed this error and had it corrected by pasting in a printed slip designated as ''errata,'' stating that the company only owned 443 acres of land. The plaintiff testified that he did not think there was any such ''errata'' in the

prospectus which he saw, or if there was he did not read it. This prospectus, however, was not obtained by him directly from the company or any of its representatives, but was obtained from a friend at the suggestion of the company's agent. Whether this correction had been accidentally or purposely removed, or whether a copy of the prospectus had been issued in some manner without the correction being pasted therein is not shown. There is no showing that any copy of the prospectus without this correction was put in circulation by authority or with the knowledge of the defendants. Nor, as stated, was this lack of raw material the cause of plaintiff's loss. It is evident that the jury found such to be the fact. What is here said applies to the limestone acreage also. The record in this case is quite voluminous and there was much evidence introduced by both parties to support their respective contentions. It would serve no useful purpose to set out such evidence in detail, as we think the above statement is sufficient for an understanding of the issues presented.

The instructions given for plaintiff are to the effect that the verdict should be for plaintiff provided the jury find that the plaintiff purchased and paid for the stock in question; that the defendant directors, by themselves or through their manager, for the purpose of inducing plaintiff and others to buy stock from said company, authorized the issuance of the prospectus which plaintiff obtained and examined before he purchased any stock, and that said prospectus contained the representations hereinbefore mentioned; that any or all of said representations were false and fraudulent, and "provided you further find that defendants knew that the above matters were false, or did not know or have knowledge as to whether or not they were true;" that if said defendants, by and through said prospectus, without knowledge of its falsity, did make any of said representations, assuming or intend-

ing to convey the impression that they had actual
knowledge of its truth, though conscious that they had
no such knowledge, then such representations were
just as fraudulent as if they had made them actually
knowing that they were false.   Similar instructions
were given as to the liability of defendant Schiffer-
decker in making the oral representations attributed
to him.

Several instructions were given for defendants,
numbered from "A" to "K," inclusive, but we think
that instructions "A," "C" and "E" will sufficiently
show the theory on which the case was submitted
on their behalf, which are as follows:

"A.  If the jury find from the evidence that neither
of the defendants, Schifferdecker, Geissinger, or Loh-
man prepared the prospectus read in evidence, but that
the same was prepared by some other officer or officers
of the Guthrie Mountain Portland Cement Company
and if you further find from the evidence that the facts
stated in said prospectus were in accord with reports
and investigations made by experts or representatives
of the said company and were in accord with the in-
formation obtained by the defendants, and if you fur-
ther find that said defendants honestly believed the
statements contained in said prospectus were true
and did not learn of any misstatements of fact there-
in (if there were any misstatements of fact therein)
prior to the purchase of stock by the plaintiff, then
the defendants are not liable for any misrepresenta-
tions or statements in said prospectus even though it
may have afterwards developed that the same were
untrue.

"C.  The court instructs the jury that the defend-
ants are not liable in this action for any neglect or
failure on their part to make personal investigations
to verify the correctness of the statements contained
in the prospectus read in evidence, provided that the
statements contained therein were in accordance with

the reports to the defendants by other officers of the corporation, and provided the defendants honestly believed the statements contained therein to be true and had no reason to believe that any statements therein contained were false.

"E.   Even though the jury may find and believe from the evidence that the defendant, Schifferdecker, made representations or statements to the witness Lambert regarding the character and condition of the property of the Guthrie Mountain Portland Cement Company and even though you may find from the evidence that some one or more of such statements were not true, yet if you further find and believe from the evidence that such statements, if any, were made by the said Schifferddecker in good faith, honestly believing the same to be true, and such belief was based on his own examination and on reports from other persons on which he relied, and that the said Schiefferdecker had no purpose or intent to mislead, deceive or defraud the plaintiff thereby, then the plaintiff cannot recover on account of any of said statements."

The giving of these instructions was excepted to and is assigned as error.

## OPINION.

STURGIS, J.—Granting that there is evidence in this case sufficient to take to the jury the question of the statements made in the prospectus being untrue in fact, the finding of the jury on that question would be final and binding on this court, provided the instructions submitting the same are found to be proper. It is therefore apparent that the real question to be determined by this court is the correctness of the instructions given by the court at the instance of defendants in submitting that question to the jury and allowing the defense of good faith and absence of willful fraud.

The instructions of plaintiff were given as asked, and there is no complaint as to refused instructions; but it is insisted in this court that the instructions given at the instance of defendants are not correct declarations of law as applied to the pleadings and facts in this case and are in conflict with the instructions given for the plaintiff.

On this phase of the case the theory of the defendants' instructions is that, in case the jury find the representations to be false, yet the defendants had a right to justify themselves in making or permitting such statements to be made on the ground that they had a right to rely on information received from reliable sources and on investigation and reports made by the experts as to the quantity and quality of the natural products owned or controlled by the corporation, provided defendants had a right to believe and did honestly believe in the correctness of such reports and representations.

On a preliminary question of pleading the defendants insist that the petition in this case counts only on the proposition that defendants had actual knowledge that the representations in question were not true, and that the court could only submit the case to the jury on this proposition and could not enlarge the issue by the instructions; that it would be a departure from the pleadings to submit the case to the jury on the proposition that the defendants made these representations recklessly and without any knowledge as to their truth or falsity and with a consciousness that they had no such knowledge. Perhaps it is a too narrow construction of the petition to hold that it counts on the actual knowledge of the representations being untrue, while the instructions are based on constructive knowledge of that fact. [Serrano v. Commission Co., 117 Mo. App. 185, 197, 200, 93 S. W. 810.]

Waiving this question of pleading and granting that the allegations of the petition are broad enough to include the issue as to defendants recklessly making representations of which they had no knowledge and under the consciousness that they had no such knowledge, the question remains to be determined whether this issue can be met by proof that the defendants, being without personal knowledge on the subject, relied on information furnished by persons in whom they relied and had a right to rely and made the representations honestly and in accordance with such information obtained from others.

In discussing this question this case must be distinguished from the class of cases where the representations are professedly made, not of personal knowledge, but from information obtained from others on which the utterer relied. Even in this class of cases the utterer may be held liable for misrepresentations where he does not correctly set forth the information obtained by him, or where he knows or has reason to know that the information which he is giving is not correct. [20 Cyc. 31.]

It should be borne in mind also that this is an action at law for fraud and deceit in making these false representations. In this it differs from the case of Lynch v. Land & Timber Co., 135 Mo. App. 672, 679, 117 S. W. 624. It is said in Kountze v. Kennedy, 147 N. Y. 124, 29 L. R. A. 363: "The law affords remedies for the consequence of innocent misrepresentation. A contract induced thereby, may, in many cases, be avoided, and the equitable powers of courts are frequently interposed for the rescission of contracts or transactions based upon mistakes or innocent misrepresentation. While the common law action of deceit furnished a remedy for fraud which ought to be preserved, we think it should be kept within its ancient limits, and should not by construction be extended to embrace dealings, which, however unfortu-

nate they may have proved to one of the parties, were not induced by actual intentional fraud on the part of the other.''

In Greene v. Worman, 83 Mo. App. 568, 574, which was a suit at law, the court said: ''These facts show such fraud *in equity* as would authorize a court to cancel the trade and set aside the conveyance of defendant to plaintiffs on proper terms, but it is not sufficient to prove fraud *in law;* and to have done this, the defendant should have gone farther, and adduced evidence showing or tending to show that Newkirk knew that the representations he made as to the boundary lines and spring were false, or that he made the representations as of his own knowledge, but did not know whether they were true or false, and that plaintiff relied on them believing them to be true. The representations though false, if innocent and were made without any intention to defraud, and under the belief that they were true, furnish no support to the allegation of fraud and deceit. [Walsh v. Morse, 80 Mo. 568; Dulaney et al. v. Rogers et al., 64 Mo. 1. c. 203; Joliffe v. Collins, 21 Mo. 338.]'' See also Adams v. Barber, 157 Mo. App. 370, 388, 130 S. W. 489.

It would seem from these and other authorities that there is a distinction in this respect between suits at law for damages and suits in equity for rescission of the contract. The measure of damages in the two classes of cases would be different and the method of trial and the relief granted would also be different. [Kendrick v. Ryus, 225 Mo. 150, 157, 123 S. W. 937, and cases cited.] In this case we are not called upon to say whether the evidence is such that, if plaintiff had brought his suit in equity to rescind the sale, the court might not have granted him some relief, which in this case would have amounted to the return on proper terms of the purchase money.

The case of Serrano v. Commission Co., 117 Mo. App. 185, 93 S. W. 810, is cited and relied on by both

parties and contains an able discussion of the principles applicable to a suit at law for damages. In this case, the court said, at the outset of the opinion (page 194), "That there must be *scienter,* either actual or constructive, in order to support an action at law for deceit, is beyond question." "*Scienter*" in this connection evidently means guilty knowledge, or a guilty lack of knowledge, and implies moral turpitude. The court discusses the three phases of *scienter* as applied to cases of this character; though in that case, as in this one, the court had to do with only two phases. The first phase of *scienter* is said to be: "A false representation made with the knowledge of its falsity by the utterer;" and "proof that the party made the false representation concerning a material fact with knowledge that the representation was false at the time it was made, satisfies the law in so far as *scienter* is concerned."

The second phase of *scienter* is said to be (page 196): "When a party makes a representation of a material fact of his own knowledge when in truth he has no knowledge whatever on the subject either of its truth or falsity."

It is further said in speaking of the first phase of *scienter,* where the parties have actual knowledge that the representation is untrue (page 200): "On this issue it was competent and proper for Mr. Teasdale to show in defense that he had sold the oranges as represented or that he had made such negotiations thereabout as to induce him to believe that he had sold the same and therefore made the representations to that effect in good faith." It is also said (page 197): "It is competent and proper for the defendant to show, in resisting such charge, that he did not know the representation was false and to this end he is permitted to show that he acted in good faith on reasonable appearances and was honestly mistaken, having good reason to believe in the truth of the representation

when made." This case cites Dulaney v. Rogers, 64 Mo. 201, and many other cases upholding this view.

In determining what is guilty lack of knowledge under the second phase of *scienter,* where a party makes a representation as of his own knowledge when in truth he has no knowledge of the subject, the authorities all hold that it is necessary that the utterer have a consciousness that he has no knowledge on the subject; that is, there must be moral turpitude in making the misrepresentation. [Bank v. Hutton, 224 Mo. 42, 65 and 72, 123 S. W. 47.] As said in Serrano v. Commission Co., supra, 198, "Under this phase of the matter, the law being satisfied by proof of the party's reckless or wanton conduct in asserting positively as of his own knowledge a fact concerning which he knew nothing of its truth or falsity, as stated above, raised up and supplies the *scienter* constructively from this reckless conduct on his part."

In the case of Western Cattle Co. v. Gates, 190 Mo. 391, 395, 89 S. W. 382, from which plaintiff's instructions were largely taken, it is said, in commenting on the instructions in that case, page 404: "The theory of the defendant's instruction is that the defendant is not liable unless he actually knew the representations to be false, whereas the theory of the plaintiff's instructions is that the defendant is liable if he made the representations actually knowing them to be false, and also if he made the representations without knowing whether they were true or false, and while *conscious* that he had no knowledge of their truth but intended to convey the impression to the plaintiff that he had actual knowledge of their truth. One who makes representations which he does not know to be true, and conscious of the fact that he has no knowledge on the subject, to another whom he knows has no knowledge as to the truth or falsity of the representation, is as much guilty of fraud as if he had actual knowledge of the falsity of the statement."

In Snyder v. Stemmons, 151 Mo. App. 156, 131 S. W. 724, it will be found that the finding of facts and declarations of law made by the court omitted the proposition "that defendant was conscious of the fact that he had no such knowledge," and that was held to be error. [See also Paretti v. Rebenack, 81 Mo. App. 494.]

In Thompson on Liability of Directors, pages 401, 402, it is held that an action at law for damages, the gist of which is *fraudulent intent,* can only be maintained against one who has been guilty of a fraudulent intent. The representations must not only be false in fact but they must have been made with an intent to deceive. "This may be inferred from evidence showing that the party making them knew of their falsity at the time, or at least professed knowledge of their truth, when, in point of fact, he was conscious he had none. But in either case falsehood uttered with intent to deceive is essential. We apprehend that it is not necessary to show that the defendants knew that the representations were untrue, but that it will be sufficient if it be made to appear that they made them with a *fraudulent mind and motive,* intending thereby to deceive and defraud, and *indifferent* as to whether they were true or not." This last statement and quotation is taken from appellant's brief.

When the court says, as they all do, that a party is guilty of actionable fraud when he makes "a representation of a material fact as of his own knowledge when in truth he has no knowledge whatever on the subject" (Serrano v. Commission Co., 117 Mo. App. 185, 196, 93 S. W. 810; Western Cattle Co. v. Gates, 190 Mo. 391, 405, 89 S. W. 382), the difficult is in determining what is meant by knowledge. Is the word "knowledge," as here used, to be restricted to purely personal knowledge—what he acquired by the use of his own physical senses only—or is it to be extended

so as to include information obtained from a reliable source? The plaintiff in this case insists that the word is used in its strictest sense of purely personal knowledge; the defendants insist that it should be understood in its broader sense and that a person has knowledge of a fact when he obtains information from a trustworthy source. We think that the contention of defendants in this respect is correct. A man who has received information of a fact from a reliable source and which he has every reason to believe and does believe, cannot, when reporting such to be a fact, have a consciousness that he has no knowledge of the subject. [Bank v. Hutton, 224 Mo. 42, 67, 123 S. W. 47.]

In Dunn v. White, 63 Mo. 181, 185, it is said: "The now generally recognized doctrine is, that in order to support a personal action for fraudulent representations it is not sufficient to show that a party made statements which he did not know to be true, and which were false in fact; there must be fraud as distinguished from mere mistake."

In the case of Lovelace v. Suter, 93 Mo. App. 429, 440, 67 S. W. 737, it is said in a learned opinion by Judge GOODE: "The real embarrassment in such disputes arises when the basis of the action is a statement or representation made by the defendant as true of his own knowledge, which he not only believed to be true, *but believed with good reason he knew to be true;* in other words an honest mistake not due to gross negligence. In our judgment, a representation of that kind though it may often make a good case to rescind a sale or *ex contractu* on a warranty, cannot make out a case of deceit for lack of a *scienter*. [Collins v. Evans, 5 Q. B. 804, 13 L. J. Q. B. 180.] Infallible knowledge of facts is never attainable, and it is, or ought to be, enough that one has carefully endeavored to learn the *truth from appropriate sources and believes he has learned it.* Such conduct is very different morally, and we think legally, from recklessly

asserting something to be true from a vague belief of its truth which the speaker has taken no pains to verify; for gross negligence is closely akin to fraud. [Western Bank of Scotland v. Addic, L. R. 1, H. L. 145.]''

The instructions given for the defendants, and which are criticised by plaintiff, we think will be found not subject to criticism and not in conflict with the instructions for plaintiff when rightfully understood and when the word ''knowledge'' is understood in its broader and legitimate sense. The instructions mentioned do, and we think rightfully, so, exonerate the defendants of making representations, which ultimately turned out to be untrue, on the ground that such representations were in accord with and fairly represented the information obtained by the defendants from experts and other sources on which defendants had a right to rely, and that defendants honestly believed that such representations were correct. When the jury was required to find that these representations were based on and in accord with the information obtained from reliable sources and were honestly believed by the defendants this excludes, and requires the jury to find against, the idea that defendants were conscious that they had no knowledge of the subject.

As shown by Judge Goode in the case of Lovelace v. Suter, 93 Mo. App. 429, 67 S. W. 737, these views are not in conflict with the cases of Hamlin v. Abell, 120 Mo. 188, 25 S. W. 516; Dunn v. White, 63 Mo. 181; Dulaney v. Rogers, 64 Mo. 201. As there stated: ''No such conclusion can be logically drawn from them; for the purpose of the court was not to dispense with the *scienter,* but to point out what may sometimes be *sufficient proof* of it, namely; an affirmation as of one's own knowledge and not merely his information, opinion or belief, that something material to the business in hand is true, when he has *no good reason* to believe it is true, and is in fact false.''

In Bank of Atchison v. Byers, 139 Mo. 627, 652, 41 S. W. 325, it is said that one of the essential elements of fraud in an action at law for damages based thereon is "knowledge by the person who made it of its falsity." Having consciousness of the falsity of his assertion by one who asserts as a fact a thing which he has no knowledge of is equivalent to having knowledge of its falsity. One or the other, however, must be proved in every case, and the jury must find that it exists in order to make the party liable. [Snyder v. Stemmons, 151 Mo. App. 156, 166, 131 S. W. 724, 20 Cyc. 24, 27.]

What is here said with reference to the representations in the prospectus applies also to the alleged oral representations made by defendant Schifferdecker. Like instructions were given as to these oral representations; and the same criticism is leveled at both, which as we have seen is untenable.

What we hold in this case is this; that when the directors of a corporation consent to the issuance of a prospectus, stating as facts certain representations therein as to its property which are in accordance with the facts obtained from trustworthy sources on proper investigation and inquiry, and which they honestly believe to be true, then it cannot be said either that they are making a statement as true about which they have no knowledge, or that they are making such statement with a consciousness that they have no knowledge concerning it.

Special mention might be made of the representations in the prospectus concerning the company's holding perpetual leases on two thousand acres of natural gas and coal lands lying immediately adjacent to the raw material property. The defense to this representation, as to all the others, is that such representation was true, and that, if it was found not to be true, it was made so far as defendants are concerned in good faith from information obtained from reliable

sources and under the honest belief that the same was true. The burden of proof rests upon the plaintiff to show that neither of these defenses exists. The evidence is not very satisfactory as to what leases the company did have on gas and coal lands. Several of the plaintiff's witnesses stated that the company held several such leases. It is not shown, however, how much land was covered by these leases or the location of same or the length of time the leases had to run. None of the leases themselves were put in evidence. We think the evidence fails to show that this representation was not true.

It is true that when defendant Schifferdecker testified at the trial that the company had some leases, it was shown by way of impeaching him that in a previous deposition he had stated that the company had no leases; but it was also shown that this witness, when such deposition was first transcribed, spoke to one of the attorneys for plaintiff claiming that this was a mistake and was advised that same should be corrected. For some cause the deposition was not corrected though it is conceded that the witness promptly noted and advised the opposite party of the mistake. We do not believe that the inadvertent admission of the witness put in evidence only for the purpose of contradiction and impeachment of his positive evidence to the contrary can be taken as supplying the positive proof required of plaintiff that the company had no leases in order to make a case for him.

Complaint is also made that the representation in the prospectus that the stock was fully paid and nonassessable is such a misrepresentation as ought to have been submitted to the jury. We think the court was right in not submitting the question of the truth or falsity of this representation to the jury. This representation clearly refers to the character of the stock and the liability of the stockholders to the corporation. The evidence shows that the stock, when issued and

paid for by the stockholders, is of the kind properly denominated fully paid and nonassessable. It does not mean and cannot be construed to be a representation that any stockholder has paid full par value for the same; and this is the only complaint made by the plaintiff. This statement applies to both the common and preferred stock. The plaintiff knew that he was not paying par value for his stock, as it is admitted that the common stock was being given as a bonus to the purchasers of the preferred stock. He was not deceived by this representation. It was properly taken by the court and by plaintiff and defendants alike, that when the purchasers paid whatever price was agreed upon in the purchase of the stock, then the stock would be as between him and the company "fully paid and nonassessable."

There are some other errors complained of in the brief, which we have examined and find do not affect the merits of the case. As the case was tried in accordance with the views herein expressed, and the instructions given submitted the facts to the jury on the proper theory, and the jury has resolved the facts against the plaintiff, the judgment should be and is affirmed.

*Farrington, J.,* concurs. *Robertson, P. J.,* concurs, except he expresses no opinion as to the next to the last paragraph, relating to the *representation of the stock* being fully paid and nonassessable, other than that plaintiff was not deceived thereby.